## KUMPULA v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. October 27, 1919.)

No. 3326.

1. ARMY AND NAVY ⟺40—INDICTMENT AND INFORMATION ⟺110(3)—ESPIONAGE ACT; INDICTMENT IN LANGUAGE OF STATUTE.

Where the charge is the willful and intentional doing of certain acts, by making certain statements with certain intentions, and such acts are made criminal by Espionage Act, tit. 1, § 3, as amended by Act May 16, 1918, § 1 (Comp. St. 1918, § 10212c), an indictment which follows the

language of the statute, and gives a statement of facts and circumstances sufficient to identify the acts charged as an offense, is good.

2. ARMY AND NAVY ☞40—ESPIONAGE ACT; INSTRUCTION AS TO CHARACTER OF I. W. W.

Evidence, in a prosecution for violation of Espionage Act, tit. 1, § 3, as amended by Act May 16, 1918, § 1 (Comp. St. 1918, § 10212c), *held* not to justify the court in instructing as matter of law that the I. W. W. is a disloyal and unpatriotic organization, and that its adherents owe no allegiance to any organized government; the literature properly admitted in evidence, and which would warrant the instruction, not being conclusively shown to be an authorized statement of the attitude of the organization as a whole.

In Error to the District Court of the United States for the District of Oregon; Charles E. Wolverton, Judge.

Criminal prosecution by the United States against Elmer Kumpula. Judgment of conviction, and defendant brings error. Reversed.

Kumpula was convicted under five counts of an indictment which charged him with violation of section 3, tit. 1, c. 30, of the act of Congress approved June 15, 1917 (40 Stat. 219), as amended by Act May 16, 1918, c. 75, § 1, 40 Stat. 553 (Comp. St. 1918, § 10212c), known as the Espionage Act. The first two counts charge that Kumpula, in the presence of certain named persons, stated "in substance and to the effect as follows, to wit: That the Liberty Bonds (meaning the bonds issued by the United States for loans) were no good and not worth the paper they were written on; that the United States was not a free country; that the United States was no good for the workingman; that the United States was always extorting every cent from the workingman." The first count charges that these statements were made with willful intent to interfere with the operation and success of the military and naval forces of the United States and to promote the cause of its enemies. The second count charges that the statements were made with intent to obstruct the sale of bonds and other securities of the United States and the making of loans to the United States. The third, fourth, and fifth counts charge the defendant with willfully and knowingly, in the presence of named persons, making statements "in substance and to the effect as follows, to wit: To hell with the government (meaning thereby the government of the United States); that it was an outrage to compel the workingman to subscribe to Liberty Bonds; that the United States was not a free country; that the United States was no good for the workingman; that the United States was always extorting every cent from the workingman; that now that the United States was at war the time was ripe for the workingmen to get together and to strike for their rights; that if all the unions and trades would strike while the United States was at war they could get anything they wanted." Count 3 charges that the statements were made with intent to urge and incite a curtailment of production by the United States of things and products essential to the prosecution of the war. Count 4 charges that the statements were willfully and knowingly made with intent to incite, encourage, and provoke resistance to the United States and to promote the success of its enemies in time of war. Count 5 charges that the statements were willfully and knowingly made with intent to support and favor the cause of a country with which the United States was then at war and to oppose the cause of the United States therein.

James E. Fenton, of Portland, Or., for plaintiff in error.

Bert E. Haney, U. S. Atty., and John C. Veatch, Asst. U. S. Atty., both of Portland, Or.

Before GILBERT and HUNT, Circuit Judges, and RUDKIN, District Judge.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

HUNT, Circuit Judge (after stating the facts as above). [1] It is contended that the indictment was insufficient, in that "the alleged libelous matter must be set out according to its tenor, and not according to its substance and effect." If the indictment under consideration were for libel, such a position would require consideration; but where the charge is the willful and intentional doing of certain acts by making certain statements with certain intentions, and the acts are made criminal by statute, an indictment which follows the language of the statute, and gives a statement of facts and circumstances sufficient to identify the acts charged as an offense, is good. Armour Packing Co. v. United States, 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681; Rhuberg v. United States, 255 Fed. 865, —— C. C. A. ——.

[2] Error is assigned to a portion of the instructions to the jury wherein the court said that evidence had been introduced for the purpose of showing that defendant was connected in some way with the I. W. W., and told the jury that such testimony should be considered, but that such evidence was offered for the purpose of showing the bent of the defendant's mind, or his attitude of mind—whether or not he was in sympathy with the government of the United States or opposed to it, whether he was in sympathy with Germany and desirous that Germany should succeed in the war rather than the United States. To such directions the court added the following:

"The I. W. W. is a disloyal and unpatriotic organization. Adherents thereof owe no allegiance to any organized government, and so far as the government is concerned the organization itself is thoroughly bad."

Defendant testified that about a year previous he had been connected with the I. W. W., but was not affiliated with it at the time of the trial; that he had never been opposed to the United States or its laws; that he had bought $200 of Liberty Bonds, and that he had not read any of the pamphlets and books found in his room.

The positive instruction that the I. W. W. is a disloyal and unpatriotic organization, and that adherents thereof owe no allegiance to any organized government, must have been based upon the contents of certain pamphlets in evidence, and which were found in defendant's room. Of the two pamphlets which seem material, one is entitled "Preamble and Constitution of the Industrial Workers of the World." Among other matters the preamble asserts:

"The working class and the employing class have nothing in common. There can be no peace, so long as hunger and want are found among millions of working people, and the few, who make up the employing class, have all the good things of life. * * * Instead of the conservative motto, 'A fair day's wages for a fair day's work,' we must inscribe on our banner the revolutionary watchword, 'Abolition of the wage system.' It is the historic mission of the working class to do away with capitalism. The army of production must be organized, not only for the everyday struggle with capitalists, but also to carry on production when capitalism shall have been overthrown. By organizing industrially we are forming the structure of the new society within the shell of the old."

The constitution itself pertains to the composition of the organization as of "actual wage-workers," brought together in an organiza-

tion "embodying Industrial Departments" and unions, and contains, among "Resolutions," the following:

"Whereas, The primary object of the Industrial Workers of the World is to unite the workers on the industrial battlefield; and whereas, organization in any sense implies discipline, through the subordination of parts to the whole, and of the individual member to the body of which he is a part: Therefore be it resolved, that to the end of promoting industrial unity, and of securing necessary discipline within the organization, the I. W. W. refuses all alliances, direct or indirect, with existing political parties or antipolitical sects, and disclaims responsibility for any individual opinion or act which may be at variance with the purposes herein expressed."

The other pamphlet is a translation of an article entitled "The Revolutionary I. W. W., by Grover H. Perry." While there is no evidence at all as to whó Grover H. Perry was, or whether he was authorized to write or speak for the order, or to announce its aims, the imprint indicates that the pamphlet was put out under the auspices of the I. W. W. organization, and we hold it was properly admitted in evidence as bearing upon the character and aims of the I. W. W. organization. State v. Lowery (Wash.) 177 Pac. 355. The pamphlet defines the I. W. W. organization as a "labor union that aspires to be the future society," sets forth the "interests in common" of all workers and the power that the I. W. W. would have if, when a strike is called, a whole industry could be paralyzed, and thus an employer "would be forced to accede to the demands of the workers. That is the way the I. W. W. proposes to organize." Further along we find this language:

"The Industrial Workers of the World is an international movement; not merely an American movement. We are 'patriotic' for our class, the working class. We realize that as workers we have no country. The flags and symbols that once meant great things to us have been seized by our employers. To-day they mean naught to us but oppression and tyranny. As long as we quarrel among ourselves over differences of nationality,. we weaken our cause; we defeat our own purpose. The practice of some craft unions is to bar men because of nationality or race. * * *

"Organizing a New Social System.—The I. W. W. is fast approaching the stage where it can accomplish its mission. This mission is revolutionary in character. The preamble of the I. W. W. constitution says in part: 'By organizing industrially we are forming the structure of the new society within the shell of the old.' That is the crux of the I. W. W. position. We are not satisfied with a fair day's wages for a fair day's work. Such a thing is impossible. Labor produces all wealth. Labor is therefore entitled to all wealth. We are going to do away with capitalism, by taking possession of the land and the machinery of production. We don't intent to buy them, either."

If the preamble and constitution of the organization are correctly expounded by the Perry pamphlet, the flag of the nation means only "oppression" and "tyranny," and the "mission" and purposes of the I. W. W. organization are to be accomplished by force, violence, and other unlawful means. Of course, where it is proven that an organization has such purposes, it should be held to be disloyal and unpatriotic. But without some further evidence to show that the pamphlet was issued by some one whose position in the order was such that the writing should be regarded as an authoritative statement of the attitude of

the organization as a whole toward the government of the United States, rather than the expression of the individual views of a member of the association, we are not satisfied that it justified the conclusion that, as a matter of law, the organization is disloyal and unpatriotic, and that its adherents owe no allegiance to any organized government.

In our opinion the evidence was of sufficient strength to go to the jury, but not to warrant a conclusive determination by the court. True, the court told the jury that, even if defendant did belong to the I. W. W., that of itself would not condemn him under the charge. But we are not satisfied that this qualification could relieve defendant of the feeling, and especially in time of war, that naturally must have arisen in the minds of the jury by the declaration of the court that the organization to which he admitted he had once belonged was disloyal and unpatriotic, and that adherents of it owed no obligation to the government.

The judgment is reversed, and the cause is remanded, with directions to grant defendant a new trial.