[Crim. No. 891. First Appellate District, Division One.—October 18, 1920.]

## THE PEOPLE, Respondent, v. JAMES P. MALLEY, Appellant.

[1] CRIMINAL SYNDICALISM ACT—SUFFICIENCY OF INDICTMENT.—In a prosecution for violation of the Criminal Syndicalism Act, an indictment employing almost the precise language of certain sections of the act and charging that the defendant did "willfully, unlawfully and feloniously circulate and publicly display, certain books, papers, pamphlets, documents and other printed and written matter, then and there in the custody and under the control of him . . . containing and carrying written advocacy, teaching and advising of criminal syndicalism, to wit: advocating, teaching and advising the commission of crime, sabotage and other willful and malicious damage and injury to property, and unlawful acts of force and violence, and unlawful methods of terrorism as a means of accomplishing a change in industrial ownership and control, and effecting political changes," states a public offense.

[2] ID.—ACTS CONSTITUTING A CRIME—PUNISHMENT—JURISDICTION OF LEGISLATURE—JUDICIAL REVIEW.—It is the exclusive province of the legislature to declare what acts, deemed by the lawmakers inimical to the public welfare, shall constitute a crime, to prohibit the same and impose appropriate penalties for a violation thereof; and judicial consideration of enactments of the kind is limited to the inquiry whether the constitutional rights of the citizen have been invaded or violated. If such rights be in nowise infringed

or abridged, the statute must stand, however harsh it may seem to those who run counter to its commands.

[3] ID.—PLEADING — CONTENTS OF INDICTMENT OR INFORMATION.— Under the provisions of the Penal Code relating thereto, an indictment or information is only required to contain a statement of the acts constituting the offense with which a defendant is charged in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended; and where the particular circumstances of the offense charged are necessary to constitute a complete offense, the pleading must be certain and direct in that regard.

[4] ID.—RELAXATION OF RULES OF COMMON LAW—RIGHT TO NOTICE OF CHARGE.—Notwithstanding the rules of the common law, with respect to criminal pleading, have been greatly relaxed in this state by legislation and judicial decision, and many of the formalities and particulars formerly deemed necessary are not now required, a defendant is still entitled to be apprised with reasonable certainty of the nature and particulars of the crime charged against him, that he may prepare his defense, and, upon acquittal or conviction, plead his jeopardy against further prosecution.

[5] ID.—LANGUAGE OF ACT—EMPLOYMENT IN INDICTMENT.—Where a statute, such as the Criminal Syndicalism Act, defines and describes the acts constituting the particular offense, it is sufficient to describe those acts in the indictment in the language employed in the statute, applying them concretely to the defendant.

[6] ID.—FAILURE TO IDENTIFY WRITINGS—SUFFICIENCY OF INDICTMENT —ABSENCE OF PREJUDICIAL ERROR.—In a prosecution for a violation of the Criminal Syndicalism Act, the failure of the indictment to specify or identify the books, papers, pamphlets, and other printed matter which it is alleged the defendant circulated and publicly displayed, or to have copies thereof attached, does not render such indictment insufficient, where it otherwise apprises the defendant of the nature of the offense with which he is charged with that reasonable certainty to which he is entitled; but even though such an indictment is defective in not identifying the matter circulated and displayed by the defendant, that is but an error in pleading, and the judgment of conviction will not be reversed on appeal, unless that error has, in the opinion of the appellate court, formed after an examination of the entire case, resulted in a miscarriage of justice.

[7] ID.—INSUFFICIENCY OF INDICTMENT—ABSENCE OF PREJUDICE TO SUBSTANTIAL RIGHTS.—No indictment is insufficient nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect which does not tend to the prejudice of a substantial right of the defendant upon its merits.

[8] ID.—EFFECT OF CIRCULATION OF WRITINGS—MOTIVE OF DEFENDANT —PROVINCE OF JURY — EVIDENCE — FINDING.—What interpretation

ought to be placed upon the printed matter circulated and dis-played by a defendant charged with a violation of the Criminal Syndicalism Act, what would be the probable effect of its circulation in the mode adopted, and what were the defendant's motives in so doing, are questions for the jury to decide, in view of all the circumstances of the time and manner of its distribution; and in this prosecution the evidence was sufficient to justify the jury's verdict against the defendant.

[9] ID.—WITHDRAWAL OF EXHIBITS—INSTRUCTION TO JURY—ABSENCE OF PREJUDICE—PRESUMPTION.—In a prosecution for a violation of the Criminal Syndicalism Act, where certain translations from Russian writings, which were found in the desk of the defendant, were admitted in evidence on behalf of the prosecution, and later, upon the suggestion of the district attorney, they were withdrawn and the court ordered the exhibits stricken out, and instructed the jury to disregard them, it will be presumed on appeal, in the absence of any affirmative showing to the contrary, that no prejudice resulted from the act of the court in this regard.

[10] ID.—INSTRUCTIONS—LIMITATION OF TERMS OF ACT.—Where the court, in such prosecution, read the indictment in full, and charged the jury that it must find the defendant guilty "of the crime as set forth in the indictment beyond all reasonable doubt," or not at all, this was a sufficient express limitation of the terms of the Criminal Syndicalism Act to the allegations contained in the indictment, notwithstanding the court read to the jury all of certain sections of the act, whereas the indictment only charged a violation of a certain subdivision of one of the sections read.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Michael J. Roche, Judge. Affirmed.

The facts are stated in the opinion of the court.

Austin Lewis and R. M. Royce for Appellant.

U. S. Webb, Attorney-General, and John H. Riordan, Deputy Attorney-General, for Respondent.

WASTE, P. J.—The defendant was indicted for violating chapter 188 of the Statutes of 1919, commonly known as the Criminal Syndicalism Act. He was found guilty and sentenced to imprisonment in the state prison. This appeal is from the order denying the motion for a new trial, and in arrest of judgment, and from the judgment of conviction

and sentence. The appellant contends that the indictment does not charge a public offense with the degree of certainty required, and that the evidence is insufficient to sustain the conviction. He alleges that error was committed in the introduction of certain exhibits which were subsequently withdrawn, and complains of the action of the trial court in reading the entire statute in its charge to the jury.

The indictment charges that the defendant circulated and publicly displayed certain books, papers, pamphlets, documents, and other printed and written matter, in his possession and custody, and under his control, containing and carrying written advocacy, teaching and advising of criminal syndicalism. The defendant interposed a demurrer to the indictment which was overruled. It is contended, on this appeal, that the ruling of the lower court was erroneous, appellant claiming that the indictment does not state facts sufficient to constitute a public offense, and that it does not contain a statement of the acts constituting the offense charged, in ordinary and concise language, in such manner as to enable a person of common understanding to know what is intended; and further, that it is faulty in neither setting out nor identifying the books, papers, pamphlets, documents, and other printed and written matter the defendant is charged with circulating and publicly displaying.

Section 1 of the act defining criminal syndicalism and sabotage, and prescribing what acts and methods in connection therewith amount to a violation of its provisions (Stats. 1919, p. 281), defines the term "criminal syndicalism" to be "any doctrine or precept advocating, teaching or aiding and abetting the commission of crime, sabotage (which word is hereby defined as meaning willful and malicious physical damage or injury to physical property), or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change." It is declared in section 2, subdivision 3, that any person who "3. Prints, publishes, edits, issues or circulates or publicly displays any book, paper, pamphlet, document, poster or written or printed matter in any other form, containing or carrying written or printed advocacy, teaching, or aid and abetment of, or advising, criminal syndicalism . . . is guilty of a felony and punishable by imprisonment in the

state prison. . . . '' Other acts constituting separate of-
fenses under the statute are set forth in section 2, under
appropriate groupings. Subdivision 1 relates to any per-
son who by spoken or written words, or personal conduct,
advocates criminal syndicalism. Subdivision 2 deals with
those who in like manner justify, or attempt to justify,
such doctrines. Subdivision 4 refers to those who organize
or become members of societies formed for the purpose of
teaching criminal syndicalism. Subdivision 5 relates to
those persons who advocate criminal syndicalism for the
purpose of accomplishing a change in industrial ownership
or control, or for effecting political changes.

[1] Omitting the necessary formal parts, the indictment
charges that the defendant did ''willfully, unlawfully and
feloniously circulate and publicly display, certain books, pa-
pers, pamphlets, documents and other printed and written
matter, then and there in the possession, custody and under
the control of him, the said James P. Malley, containing
and carrying written advocacy, teaching and advising of
criminal syndicalism, to wit: advocating, teaching and ad-
vising the commission of crime, sabotage and other willful
and malicious damage and injury to property, and unlawful
acts of force and violence, and unlawful methods of ter-
rorism as a means of accomplishing a change in industrial
ownership and control, and effecting political changes.''
This averment, it will be noted, substantially follows the
language of section 1 and section 2, subdivision 3 of the
statute, by the terms of which the commission of the acts,
alleged in the indictment, is made a criminal offense. In
support of the sufficiency of the indictment the attorney-
general cites *In re McDermott,* 180 Cal. 783, [183 Pac. 437],
wherein on an application for a writ of *habeas corpus* the
supreme court said that the complaint, or deposition, in al-
most the exact language of the pleading in this case stated
an offense under the provisions of the ''act defining criminal
syndicalism.'' But, in the later case of *Whitney* v. *Supe-
rior Court,* 182 Cal. 114, [187 Pac. 12], the court said that
the objections to the sufficiency of the information to state a
public offense fell within the rule announced in *In re Ruef,*
150 Cal. 665, [89 Pac. 605], in which it was held that where
an indictment purports, or attempts, to state an offense, the
question whether the facts charged are sufficient will not be

examined into on *habeas corpus*. Therefore, the McDermott decision may not be relied upon to support the indictment in this case.

To hold that the indictment does not state a public offense would be to say that the statute defines none, for, as we shall presently show, the former follows and employs almost the precise language of certain sections of the act. The language of the statute and of the indictment being the same, the latter must be understood in the same sense as the former. (*People* v. *White*, 34 Cal. 183, 186). In enacting the Criminal Syndicalism Act, the legislature declared in one of its provisions that it concerns and is necessary to the immediate preservation of the public peace and safety. [2] It has power to repress whatever it deems hurtful to the general good, the only limitations being those prescribed in the constitution. (*Ex parte Andrews*, 18 Cal. 679, 682.) This precise question was very recently considered by the supreme court of the state of Minnesota. Every objection, we think, urged against this indictment was made there in an attack upon the constitutionality of a statute, so similar as to be almost identical in many respects with ours. It was there squarely held that no right granted or secured to the citizen, by either the federal or state constitution, was taken away or in any way impaired by the act. The opinion aptly disposes of much of appellant's argument here as is shown by the following quotation: "The design and purpose of the legislature in the enactment of the statute was the suppression of what was deemed by the lawmakers a growing menace to law and order in the state, arising from the practice of sabotage and other unlawful methods of terrorism employed . . . in furtherance of industrial ends and in adjustment of alleged grievances against employers. The facts surrounding the practice of sabotage, and like *in terrorem* methods of self-adjudication of alleged wrongs, are matters of common knowledge and general public notoriety of which the courts will take notice. That they are unlawful and within the restrictive power of the legislature is clear. Sabotage, as practiced by those advocating it as an appropriate and proper method of adjusting labor troubles embraces, among other lesser offensive acts, the willful and intentional injury to or destruction of the property of the employer in retaliation for his failure or refusal to comply

with wage or other kindred labor demands. It amounts to malicious mischief and is a crime at common law as well as by statute. The methods of terrorism referred to in the statute have close relation to sabotage, and are practiced for the purpose of intimidation, and to coerce employers into a compliance with labor demands. Methods of that sort are equally unlawful and open to legislative condemnation.

"It is the exclusive province of the legislature to declare what acts, deemed by the lawmakers inimical to the public welfare, shall constitute a crime, to prohibit the same and impose appropriate penalties for a violation thereof. With the wisdom and propriety thereof the courts are not concerned. (*State* v. *Shevlin-Carpenter Co.,* 99 Minn. 158, [9 Ann. Cas. 634, 108 N. W. 935]; Clark & Marshall on Crimes, par. 41.) Judicial consideration of enactments of the kind is limited to the inquiry whether the constitutional rights of the citizen have been invaded or violated. If such rights be in nowise infringed or abridged, the statute must stand, however harsh it may seem to those who run counter to its commands. It requires no argument to demonstrate that the subject matter of this statute was and is within legislative cognizance, vesting in that body the clear right to prohibit the advocacy or teaching of the iniquitous and unlawful doctrines which it condemns." (*State* v. *Moilen,* 140 Minn. 112, 114, [1 A. L. R. 331, 167 N. W. 345, 346].)

The supreme court of California has said that no reason for holding the act beyond legislative power is obvious to it. (*In re McDermott,* 180 Cal. 783, [183 Pac. 437].) None is made to appear to us, in so far as its provisions are material in this case.

The rules by which the sufficiency of the pleadings in criminal actions is to be determined are those prescribed by the Penal Code of this state. [3] Under its provisions an indictment or information is only required to contain a statement of the acts constituting the offense, with which a defendant is charged, in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended. If the particular circumstances of the offense charged are necessary to constitute a complete offense, the pleading must be direct, and certain in that regard. The words used are to be construed in their usual acceptance in common language, ex-

cept such words and phrases as are defined by law, which are to be construed according to their legal meaning. Words used in a statute to define a public offense need not be strictly followed, but other words conveying the same meaning may be used. The degree of certainty must be such as to enable the court to pronounce judgment, upon a conviction, according to the right of the case. When these simple requirements have been complied with the indictment, or information, is sufficient as to the statement of the act, or omission, charged as the offense (Pen. Code, secs. 948, 950, 952, 957, 958, 959). These sections were taken almost *verbatim* from the first "act to regulate proceedings in criminal cases," passed by the legislature in 1850 (Stats. 1850, pp. 275, 293, 294), under which it was almost immediately held that the "subtle distinctions and nice technicalities usually observed in an indictment at common law" had been abolished, and that only the substantial facts necessary to constitute the crime charged must appear. (*People* v. *Thompson,* 4 Cal. 238, 239.) Not long afterward it was held that while the substantial facts necessary to constitute the crime charged must appear in the indictment with sufficient certainty to enable the court to pronounce a proper judgment, and the party to defend the charge, it was not necessary that they be stated with the particularity which was required at common law, it being sufficient if a man of ordinary intelligence could understand that under such circumstances an offense had been committed. (*People* v. *Dolan,* 9 Cal. 576, 583.) The modern disposition to relax much of the ancient strictness in criminal proceedings, followed by the legislature in substituting "in the place of the old, a new system of practice and pleading, which retains all the elements of the former so far as they are made necessary by a due regard for the substantial rights of a defendant, but discards all such elements as serve to no good purpose, and only tend to embarrass and defeat the administration of justice," was approvingly referred to in *People* v. *King,* 27 Cal. 507, 510, 511, [87 Am. Dec. 95], where the court said: "If the defendant is guilty, he stands in need of no information to be derived from a perusal of the indictment, as to the means used by him in committing the act, or the manner in which it was done, for as to both his own knowledge is quite as reliable as any statements contained in the

indictment. If he is not guilty, the information could not aid in the preparation of his defense.''

In keeping with the broad construction placed by it upon the action of the legislature, in establishing the more liberal method of pleading in criminal cases, the supreme court, from the start uniformly held, in respect to indictments generally, that they were sufficient, in matter of averments, if they contained allegations of all the acts, or facts used by the legislature in defining the particular offense charged. (*People* v. *Cronin,* 34 Cal. 191, 208; *People* v. *Murray,* 67 Cal. 103, [7 Pac. 178]; *People* v. *Rozelle,* 78 Cal. 84, 90, [20 Pac. 36].) Shortly after the Penal Code was adopted the court held that none of its sections changed the rules of pleading so as to require a more specific allegation of the means employed in the commission of an offense than was necessary under the former statute. (*People* v. *Weaver,* 47 Cal. 106, 107.)

[4] As corollary to these rules of construction, and ever mindful of the lack of care on the part of prosecuting officers, in the preparation of pleadings in criminal matters, to which Chief Justice Murray called attention in the early case of *People* v. *Thompson, supra,* the court has as consistently held that while it is a fact that the rules of the common law with respect to criminal pleading have been greatly relaxed in this state by legislation and judicial decision, and many of the formalities and particulars formerly deemed necessary are not now required, there are certain fundamental principles which have neither been abrogated nor modified. A defendant is still entitled to be apprised with reasonable certainty of the nature and particulars of the crime charged against him, that he may prepare his defense, and, upon acquittal or conviction, plead his jeopardy against further prosecution. A defendant is entitled, under any statute, to a clear statement of the offense with which he is charged. (*People* v. *Lee,* 107 Cal. 477, 480, [40 Pac. 754]; *People* v. *Webber,* 138 Cal. 145, 149, [70 Pac. 1089]; *People* v. *Bergotini,* 172 Cal. 717, 720, [158 Pac. 198].)

Several separate, different, and distinct acts are enumerated in the Criminal Syndicalism Act, the commission of each or any of which constitutes a specific offense, though the same crime, and the defendant, in order to make his defense, was entitled to know what wrong he was charged

with. The indictment, as already pointed out, follows substantially the language of section 1, and section 2, subdivision 3 of the act, by the terms of which the commission of the acts there enumerated is made a criminal offense. [5] As the statute defines, and describes, the acts constituting the particular offense, it was sufficient to describe those acts in the indictment in the language employed in the statute, applying them, of course, concretely to the defendant. (*People* v. *Ward*, 110 Cal. 369, 372, [42 Pac. 894].) No more was required than that the indictment be direct and certain, and allege all the acts and facts which the legislature has said shall constitute the offense. (*People* v. *Fowler*, 88 Cal. 136, 138, [25 Pac. 1110].) The defendant was only entitled to be apprised with *reasonable* certainty of the nature and particulars of the crime charged against him. (*People* v. *Lee, supra.*) Absolute certainty is not guaranteed to him by either legislation or judicial decision.

Had this defendant been charged with merely committing an act of criminal syndicalism in general terms, his objections would be well taken, but he was charged with the commission of a public offense by an indictment, the words of which he, and all others, were bound to construe in their usual acceptance in common language, except the word "sabotage," which carried with it the definition and legal meaning given to it by the statute. (Pen. Code, sec. 957.) He was informed in ordinary and concise language of the acts constituting the alleged crime. No other circumstances were necessary to constitute a complete offense. Bound, as we are, by the unbroken line of authorities in this state to the effect that only in exceptional cases, of which this is not one, is it necessary to do more than set out the offense in the language of the statute, we must hold this indictment sufficient. It contains, in a clear and concise statement, allegations of all the acts and facts used by the legislature in defining the particular offense with which the defendant is charged. According to the established rules of pleading the defendant was informed of the nature and cause of the accusation against him. (*Burton* v. *United States*, 202 U. S. 344, 372, [6 Ann. Cas. 362, 50 L. Ed. 1057, 26 Sup. Ct. Rep. 688, see, also, Rose's U. S. Notes].)

[6] The indictment did not specify or identify the books, papers, pamphlets, documents, and other printed matter

which it is alleged the defendant circulated and publicly displayed, and no copies are attached. Appellant therefore urges the contention that the allegations that the defendant circulated and publicly displayed books and other matter "containing and carrying written advocacy, teaching and advising of criminal syndicalism" states but a conclusion of law, and also that unless the books and other matter so circulated and displayed be identified, or particularly described, the defendant is without means of knowledge sufficient to enable him to prepare a defense. We are not wholly satisfied with the indictment in this respect. We have examined a number of the decisions dealing with prosecutions similar to the one at bar. In nearly every instance, so far as we have gone, some means of identification of the documents in question was adopted. In some cases copies of publications, circulars, and pamphlets were attached to the indictment. (*Abrams* v. *United States,* 250 U. S. 616, [63 L. Ed. 1173, 40 Sup. Ct. Rep. 17].) In another photographic copies of posters were attached. (*State* v. *Moilen,* 140 Minn. 112, [1 A. L. R. 331, 167 N. W. 345].) In others the book, or publication, is described by name or other designation. (*Pierce* v. *United States,* 252 U. S. 239, [64 L. Ed. 542, 40 Sup. Ct. Rep. 205].) While this procedure was followed in the other jurisdictions, and we highly commend its adoption in a spirit of fairness toward defendants charged with the particular offenses described by the criminal syndicalism statute, we are not prepared to hold that the omission to do so will prove fatal to a conviction under the circumstances of this and similar cases. We have already announced our conclusion that the defendant was apprised of the nature of the offense, with which he was charged, with that reasonable certainty to which he was entitled. This is not one of those cases in which any further statement of acts or facts is required to allege a complete offense beyond the language employed in the statute. It was not necessary, therefore, to aver the means by which the defendant devoted himself to the dissemination of the propaganda of criminal syndicalism, which is the evil the statute strikes at. He was sufficiently charged with doing certain acts which the law forbids, the doing of which is made a criminal offense. (*Ex parte Foley,* 62 Cal. 508; *People* v. *Hunt,* 120 Cal. 281, [52 Pac. 658].)

Even though the indictment was defective in not identifying the matter circulated and displayed by the defendant, which we do not in the least admit, it was but an error in pleading and following the mandatory direction of the constitution (sec. 4½ of art. VI), the judgment should not be reversed unless the error of pleading has, in the opinion of this court, formed after an examination of the entire case, resulted in a miscarriage of justice. (*People* v. *Griesheimer,* 176 Cal. 44, 49, [167 Pac. 521]; *People* v. *Bonfanti,* 40 Cal. App. 614, [181 Pac. 80].) **[7]** No indictment is insufficient, in this state, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect which does not tend to the prejudice of a substantial right of the defendant upon its merits. (Pen. Code, sec. 960; *People* v. *Rozelle,* 78 Cal. 84, 90, [20 Pac. 36]; *People* v. *Ah Sing,* 95 Cal. 654, 656, [30 Pac. 796].) That phase of the case we shall presently consider.

It was not necessary to specify the books, papers, pamphlets, or documents alleged to have been circulated and displayed by the defendant, in order to protect him from a second prosecution for the offense. If he should be again prosecuted for the offense, he may plead his conviction in the manner provided by the code, and establish the identity of the cases by evidence, the burden being upon him. (*People* v. *Faust,* 113 Cal. 172, 176, [45 Pac. 261]; *People* v. *Burke,* 18 Cal. App. 72, 81, [122 Pac. 435].)

The appellant contends that the evidence in this case is insufficient to warrant his conviction. He was shown to be a member and the secretary of the San Francisco branch of the Industrial Workers of the World, an international organization, or movement, commonly known and designated as the "I. W. W." As such secretary he was in charge of its headquarters and the place of assemblage of the members of the organization. On tables and in bookcases in the rooms were openly displayed, and exposed for sale, large quantities of pamphlets and other printed matter, in order to purchase any of which it was necessary to consult the defendant, who stated to a number of persons previous to his arrest that it was "for sale." There were introduced in evidence as being part of the printed matter thus offered for sale by the defendant: A copy of "The One Big Union Monthly," a magazine published by the General Ex-

ecutive Board of the Industrial Workers of the World, and devoted to the dissemination of the preamble and doctrines of the organization, and manifestly devoted to advancing the "triumph of the one big Union"; "The Liberator—a Journal of Revolutionary Progress," a considerable portion of which publication appears to be devoted to extolling Eugene V. Debs and "the invincible I. W. W."; a pamphlet entitled "The Revolutionary I. W. W.," by Grover H. Perry, from which it appears, according to its author, that "the I. W. W. is fast approaching the stage where it can accomplish its mission"; "The Red Dawn—The Bolsheviki and the I. W. W.," in which "the lesson of the Bolsheviki and the road to power of the I. W. W." are offered as a means of advancement to industrial freedom; a leaflet entitled "Poison Gas and Violence"; two books of songs, one entitled "I. W. W. Songs—To Fan the Flames of Discontent," and the other bearing a frontispiece depicting a female figure bearing a shield on which are the words "Solidarity, Class Consciousness," holding aloft a blazing torch, and standing on a platform upon which are the words "I Will Win"; a pamphlet entitled "I. W. W., One Big Union of all the Workers, The Greatest Thing on Earth"; a Russian revolutionary pamphlet, entitled "Lessons of the Revolution, by Vladimir Oulianow (N. Lenin), translated from the Russian original and published by the Bureau of International Revolutionary Propaganda attached to the Commissariat for foreign affairs of the Provisional Workmen's and Peasants' Government of the Russian Republic." This pamphlet, which bears a rubber stamp indorsement "I. W. W. Hall, 1135 Mission St.," accords "all power to the Soviets," which "means a complete surrender of the administration of the country and of control over its economic resources to the workmen and peasants, whom no one would dare to resist, and who would soon learn by experience, from their own practice, justly to distribute the bread, the land, and the necessities."

We do not think it is necessary to make long quotations from these various publications, which were introduced in evidence, in order to illustrate the nature of their contents. One excerpt from the pamphlet "The Revolutionary I. W. W.," by Grover H. Perry, will suffice. The pamphlet defines the I. W. W. organization as a "labor union that as

49 Cal. App.—39

pires to be the future society," sets forth the "interests in common" of all workers and the power that the I. W. W. would have if, when a strike is called, a whole industry could be paralyzed, and thus an employer "would be forced to accede to the demands of the workers. That is the way the I. W. W. proposes to organize." Further along we find this language:

"The Industrial Workers of the World is an international movement; not merely an American movement. We are 'patriotic' for our class, the working class. We realize that as workers we have no country. The flags and symbols that once meant great things to us have been seized by our employers. Today they mean naught to us but oppression and tyranny. As long as we quarrel among ourselves over differences of nationality, we weaken our cause; we defeat our own purpose. The practice of some craft unions is to bar men because of nationality or race. . . .

"Organizing a New Social System.—The I. W. W. is fast approaching the stage where it can accomplish its mission. This mission is revolutionary in character. The preamble of the I. W. W. constitution says in part: 'By organizing industrially we are forming the structure of the new society within the shell of the old.' That is the crux of the I. W. W. position. We are not satisfied with a fair day's wages for a fair day's work. Such a thing is impossible. Labor produces all wealth. Labor is therefore entitled to all wealth. We are going to do away with capitalism, by taking possession of the land and the machinery of production. We don't intend to buy them, either."

As was well said by the writer of the opinion in *Kumpula v. United States*, 261 Fed. 49, 52, [171 C. C. A. 645, 648], in commenting upon this identical language: "If the preamble and constitution of the organization are correctly expounded by the Perry pamphlet, the flag of the nation means only 'oppression' and 'tyranny,' and the 'mission' and purposes of the I. W. W. organization are to be accomplished by force, violence, and other unlawful means."

We have already alluded to the design and purpose of the legislature in the enactment of the statute. "Sabotage," in the ordinary sense of the word, means the "malicious waste or destruction of an employer's property by workmen during labor troubles." (Webster's New International Dictionary,

1919.) Its legal meaning, as applied by the legislature, is found in the statute which defines criminal syndicalism as "any doctrine or precept advocating, teaching or aiding and abetting the commission of crime, sabotage (which word is hereby defined as meaning willful and malicious physical damage or injury to physical property), or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change." The circulation or display of printed matter, in any form, containing "advocacy, teaching or aid and abetment of, or advising criminal syndicalism" is prohibited by the act, the incentive for the adoption of which, as stated in one of its sections, was the fact that large numbers of persons were then going from place to place in this state, advocating, teaching, and practicing the doctrine of sabotage, and other unlawful acts of force, violence, and unlawful means of terrorism, employed in furtherance of industrial demands, and in settlement of alleged grievances against their employers. So insistent was the danger that the legislature departed from its usual course, and provided that the act, destined to put a stop to the practices therein made unlawful, should have immediate effect. It was the *unlawful* acts of force and *unlawful* methods of terrorism that the legislature struck at, not acts which are permissible and within the law. (*In re Hartman,* 182 Cal. 447, [188 Pac. 548].)

Appellant's arrest, and subsequent conviction, followed not long after the enactment of the law. When arrested, the defendant declared that he was not a citizen of the United States, and that he had no desire to be one. A copy of the Criminal Syndicalism Act, under which this prosecution is lodged, was posted conspicuously upon the wall in the headquarters. We are satisfied from the record that the defendant distributed the literature under his control and in his possession with full understanding of its nature; and this, of itself, furnished a ground for attributing to him an intent to bring about, and for finding that he was thereby attempting to bring about, any and all such consequences as might reasonably be anticipated from its distribution. (*Pierce* v. *United States,* 252 U. S. 239, 249, [64 L. Ed. 542, 40 Sup. Ct. Rep. 205, 209].)

[8] The question presented in this case is whether the printed matter was circulated under such circumstances, and is of such nature as to create a clear and present danger, or to bring about an evil, that the legislature had a right to prevent; or, stated in another way, does this case so made show an advocacy and teaching of the form of sabotage, or the other methods of terrorism designed to effect industrial and political ends which the statute condemns? It was held in *State* v. *Moilen,* 140 Minn. 112, [1 A. L. R. 331, 167 N. W. 345, 348], that the question was one for the jury. What interpretation ought to be placed upon the printed matter circulated and displayed by the defendant, what would be the probable effect of its circulation in the mode adopted, and what were defendant's motives in so doing, were questions for the jury to decide, in view of all the circumstances of the time and manner of its distribution. (*Pierce* v. *United States, supra; Schenck* v. *United States,* 249 U. S. 47, 52, [63 L. Ed. 470, 39 Sup. Ct. Rep. 247].) Its decision, on evidence which we deem sufficient, is against the defendant. We do not think it necessary to dwell longer upon this phase of the question, important as it is, for the reason that the eminent authorities already cited seem to conclusively set the matter at rest, both as to the nature of the evidence and the power of the jury to make the ultimate decision in the matter.

[9] During the trial the court admitted in evidence on behalf of the prosecution certain translations from Russian writings, and a copy of "I. W. W., Its History, Structure and Methods, by Vincent St. John," which were found in the desk of the defendant. Later, upon the suggestion of the district attorney, they were withdrawn. The court thereupon ordered the exhibits stricken out, and instructed the jury to disregard them. Defendant contends that prejudicial error resulted from the admission of these exhibits, which was not cured by their subsequent withdrawal, and the instructions of the court. He fails to point out, however, where any error resulted, relying merely upon *People* v. *Derbert,* 138 Cal. 467, 470, [71 Pac. 564], which deals with alleged misconduct on the part of the district attorney, in persisting, against the ruling of the court, in asking improper questions. The decision has no bearing on the facts of the case at bar. In the absence of any affirmative show-

ing, it will be presumed that no prejudice resulted from the act of the court in this regard. (*People* v. *Lapara,* 181 Cal. 66, [183 Pac. 545].)

[10] Appellant's last contention is that the court erred in reading all of sections 1 and 2 of the Criminal Syndicalism Act in its charge, instead of instructing the jury that the defendant was only charged with violating subdivision 3 of said section 2, which specifically relates to the printing, publishing, and displaying of certain printed matter. The court, however, read the indictment in full, and charged the jury that it must find the defendant guilty "of the crime as set forth in the indictment beyond all reasonable doubt," or not at all. This was a sufficient express limitation of the terms of the act to the allegations contained in the indictment. (*Hargrave* v. *State* (Tex. Cr.), 30 S. W. 444; *Simons* v. *State* (Tex. Cr.), 34 S. W. 619, 620; *People* v. *Young,* 44 Cal. App. 279, [186 Pac. 383].)

The defendant was charged with a public offense in an indictment which was sufficient for that purpose. His guilt was established to the satisfaction of the jury upon evidence of sufficient probative force to warrant the conviction. No miscarriage of justice resulted from any matter occurring in connection with the overruling of the demurrer. or rulings of the court during the trial.

The orders denying defendant's motions for a new trial, and in arrest of judgment, and the judgment are and each is affirmed.

Richards, J., and Beasly, J., *pro tem.,* concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on November 6, 1920.