## CARR *et al.* v. THE STATE.

No. 9153. NOVEMBER 21, 1932.

*W. A. McClellan, O. C. Hancock,* and *W. A. McClellan Jr.,* for plaintiffs in error.

*John A. Boykin, solicitor-general, J. W. LeCraw,* and *John H. Hudson,* contra.

GILBERT, J. The exception is to the overruling of demurrers to an indictment charging that Carr and Powers did, "with intent to incite insurrection and to abolish, defeat, and overthrow by acts of violence the lawful authority of the State of Georgia," introduce and circulate "certain papers, pamphlets, sheets, circulars, and writing, for the purpose of inciting insurrection, riot, conspiracy,

and resistance against the lawful authority of the State of Georgia and against the lives of the inhabitants thereof, to wit: 'The program of the Communist Party includes the organization of the working class in every phase of life. It leads the struggles of the workers, from the most simple every-day demand, clear up to the final struggle for the overthrow of capitalism and the establishment of the workers' government—the proletarian dictatorship. (8) Against bosses' wars. Defend the Soviet Union. (9) Smash the National Guard, the C. M. T. C., and R. O. T. C.'" The demurrer states that the indictment is based on the Penal Code (1910), § 58, which is as follows: "If any person shall bring, introduce, print, or circulate, or cause to be introduced, circulated, or printed, or aid or assist, or be in any manner instrumental in bringing, introducing, circulating, or printing within this State any paper, pamphlet, circular, or any writing, for the purpose of inciting insurrection, riot, conspiracy, or resistance against the lawful authority of the State, or against the lives of the inhabitants thereof, or any part of them, he shall be punished by confinement in the penitentiary for not less than five nor longer than twenty years." It is contended (a) that the section is "unconstitutional, null, void, and of no force," because it is "too vague, meagre, and indefinite to put" defendant on notice of "what act is attempted to be penalized" thereby; (b) that said section "is unconstitutional and is in contravention of the constitutional guarantee of liberty of speech and of the press" (art. 1, sec. 1, par. 15; Civil Code (1910), § 6371), as follows: "No law shall ever be passed to curtail or restrain the liberty of speech, or of the press; any person may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty." And (c) that the section "is unconstitutional and is in contravention" of the provisions of the fourteenth amendment to the Federal constitution (Civil Code (1910), § 6700), "and tends to deprive this defendant of life and liberty without due process of law," and the law upon which the indictment is based is "contrary to the provisions of" that amendment "and abridges the privileges and immunities of citizens of the United States, and tends to deprive said citizens of life, liberty, and property without due process of law." It is obvious that a statute can not be said to be unconstitutional because "it is too vague, meagre, and indefinite to put" defendant on notice of "what

act is attempted to be penalized," as contended in the fifth ground of the demurrer. Moreover, the sufficiency of such a ground of demurrer will be discussed hereinafter.

1. The sixth and seventh grounds of the demurrer attacking the statute on constitutional grounds will be discussed together. The briefs of both plaintiffs in error and defendant in error contain many citations. Naturally, on such a subject many views have been expressed by law writers and courts. We think it unnecessary to discuss these citations in detail, since the whole subject has been authoritatively considered and decided by the very highest authority. We quote from the opinion in the case of Gitlow *v.* People of New York, 268 U. S. 652, 665 (45 Sup. Ct. 625, 69 L. ed. 1138), as follows: "The Manifesto, plainly, is neither the statement of abstract doctrine nor, as suggested by counsel, mere prediction that industrial disturbances and revolutionary mass strikes will result spontaneously in an inevitable process of evolution in the economic system. It advocates and urges in fervent language mass action which shall progressively foment industrial disturbances and through political mass strikes and revolutionary mass action overthrow and destroy organized parliamentary government. It concludes with a call to action in these words: 'The proletariat revolution and the Communist reconstruction of society—the struggle for these—is now indispensable. . . The Communist International calls the proletariat of the world to the final struggle!' This is not the expression of philosophical abstraction, the mere prediction of future events; it is the language of direct incitement. The means advocated for bringing about the destruction of organized parliamentary government, namely, mass industrial revolts usurping the functions of municipal government, political mass strikes directed against the parliamentary State, and revolutionary mass action for its final destruction, necessarily imply the use of force and violence, and in their essential nature are inherently unlawful in a constitutional government of law and order. That the jury were warranted in finding that the Manifesto advocated not merely the abstract doctrine of overthrowing organized government by force, violence, and unlawful means, but action to that end, is clear.

"For present purposes we may and do assume that freedom of speech and of the press—which are protected by the first amend-

ment from abridgement by Congress—are among the fundamental personal rights and 'liberties' protected by the due-process clause of the fourteenth amendment from impairment by the States. We do not regard the incidental statement in Prudential Ins Co. v. Cheek, 259 U. S. 530, 543 [42 Sup. Ct. 516, 66 L. ed. 1044, 27 A. L. R. 27], that the fourteenth amendment imposes no restrictions on the States concerning freedom of speech, as determinative of this question. It is a fundamental principle, long established, that the freedom of speech and of the press which is secured by the constitution does not confer an absolute right to speak or publish, without responsibility, whatever one may choose, or an unrestricted and unbridled license that gives immunity for every possible use of language and prevents the punishment of those who abuse this freedom. 2 Story on the Constitution (5th ed), § 1580, p. 634; Robertson v. Baldwin, 165 U. S. 275, 281 [17 Sup. Ct. 326, 41 L. ed. 715]; Patterson v. Colorado, 205 U. S. 454, 462 [27 Sup. Ct. 556, 51 L. ed. 879, 10 Ann. Cas. 689]; Fox v. Washington, 236 U. S. 273, 276 [35 Sup. Ct. 383, 59 L. ed. 573]; Schenck v. United States, 249 U. S. 47, 52 [39 Sup. Ct. 247, 63 L. ed. 470]; Frohwerk v. United States, 249 U. S. 204, 206 [39 Sup. Ct. 249, 63 L. ed. 561]; Debs v. United States, 249 U. S. 211, 213 [39 Sup. Ct. 252, 63 L. ed. 566]; Schaefer v. United States, 251 U. S. 466, 474 [40 Sup. Ct. 259, 64 L. ed. 360]; Gilbert v. Minnesota, 254 U. S. 325, 332 [41 Sup. Ct. 125, 65 L. ed. 287]; Warren v. United States [106 C. C. A. 156], 183 Fed. 718, 721 [33 L. R. A. (N. S.) 800]. Reasonably limited, it was said by Story in the passage cited, this freedom is an inestimable privilege in a free government; without such limitation, it might become the scourge of the republic. That a State in the exercise of its police power may punish those who abuse this freedom by utterances inimical to the public welfare, tending to corrupt public morals, incite to crime, or disturb the public peace, is not open to question. Robertson v. Baldwin, supra, p. 281; Patterson v. Colorado, supra, p. 642; Fox v. Washington, supra, p. 277; Gilbert v. Minnesota, supra, p. 339; People v. Most, 171 N. Y. 423, 431 [64 N. E. 175, 58 L. R. A. 509]; State v. Holm, 139 Minn. 267, 275 [166 N. W. 181, L. R. A. 1918C, 304]; State v. Hennessy, 114 Wash. 351, 359 [195 Pac. 211]; State v. Boyd, 86 N. J. L. 75, 79 [91 Atl. 586]; State v. McKee, 73 Conn. 18, 27 [46 Atl. 409, 49 L. R. A. 542, 84 Am.

St. R. 124]. Thus it was held by this court, in the Fox case, that a State may punish publications advocating and encouraging a breach of its criminal laws; and, in the Gilbert case, that a State may punish utterances teaching or advocating that its citizens should not assist the United States in prosecuting or carrying on war with its public enemies.

"And, for yet more imperative reasons, a State may punish utterances endangering the foundations of organized government and threatening its overthrow by unlawful means. These imperil its own existence as a constitutional State. Freedom of speech and press, said Story (supra), does not protect disturbances to the public peace or the attempt to subvert the government. It does not protect publications or teachings which tend to subvert or imperil the government or to impede or hinder it in the performance of its governmental duties. State v. Holm, supra, p. 275. It does not protect publications prompting the overthrow of government by force; the punishment of those who publish articles which tend to destroy organized society being essential to the security of freedom and the stability of the State. People v. Most, supra, pp. 431, 432. And a State may penalize utterances which openly advocate the overthrow of the representative and constitutional form of government of the United States and the several States by violence or other unlawful means. People v. Lloyd, 304 Ill. 23, 34 [136 N. E. 505]. See also State v. Tachin, 92 N. J. L. 269, 274 [106 Atl. 145], and People v. Steelik, 187 Cal. 361, 375 [203 Pac. 78]. In short this freedom does not deprive a State of the primary and essential right of self-preservation; which, so long as human governments endure, they can not be denied. Turner v. Williams, 194 U. S. 279, 294 [24 Sup. Ct. 719, 48 L. ed. 979]. In Toledo Newspaper Co. v. United States, 247 U. S. 402, 419 [38 Sup. Ct. 560, 62 L. ed. 1186], it was said: 'The safeguarding and fructification of free and constitutional institutions is the very basis and mainstay upon which the freedom of the press rests, and that freedom, therefore, does not and can not be held to include the right virtually to destroy such institutions.'

"By enacting the present statute the State has determined, through its legislative body, that utterances advocating the overthrow of organized government by force, violence, and unlawful means, are so inimical to the general welfare and involve such danger of sub-

stantive evil that they may be penalized in the exercise of its police power. That determination must be given great weight. Every presumption is to be indulged in favor of the validity of the statute. Mugler v. Kansas, 123 U. S. 623, 661 [8 Sup. Ct. 273, 31 L. ed. 205]. And the case is to be considered 'in the light of the principle that the State is primarily the judge of regulations required in the interest of public safety and welfare;' and that its police 'statutes may only be declared unconstitutional where they are arbitrary or unreasonable attempts to exercise authority vested in the State in the public interest.' Great Northern Ry. v. Clara City, 246 U. S. 434, 439 [38 Sup. Ct. 346, 62 L. ed. 817]. That utterances inciting to the overthrow of organized government by unlawful means present a sufficient danger of substantive evil to bring their punishment within the range of legislative discretion, is clear. Such utterances, by their very nature, involve danger to the public peace and to the security of the State. They threaten breaches of the peace and ultimate revolution. And the immediate danger is none the less real and substantial because the effect of a given utterance can not be accurately foreseen. The State can not reasonably be required to measure the danger from every such utterance in the nice balance of a jeweler's scale. A single revolutionary spark may kindle a fire that, smouldering for a time, may burst into a sweeping and destructive conflagration. It can not be said that the State is acting arbitrarily or unreasonably when, in the exercise of its judgment as to the measures necessary to protect the public peace and safety, it seeks to extinguish the spark without waiting until it has enkindled the flame or blazed into the conflagration. It can not reasonably be required to defer the adoption of measures for its own peace and safety until the revolutionary utterances lead to actual disturbances of the public peace or imminent and immediate danger of its own destruction; but it may, in the exercise of its judgment, suppress the threatened danger in its incipiency. In People v. Lloyd, supra, p. 35, it was aptly said: 'Manifestly, the legislature has authority to forbid the advocacy of a doctrine designed and intended to overthrow the government, without waiting until there is a present and imminent danger of the success of the plan advocated. If the State were compelled to wait until the apprehended danger became certain, then its right to protect itself would come into being simultaneously with the

overthrow of the government, when there would be neither prosecuting officers nor courts for the enforcement of the law.'"

We cite, on the same question, Whitney v. California, 274 U. S. 357 (47 Sup. Ct. 641, 71 L. ed. 1095), and cit. The excerpt just quoted is only a part of the opinion, but it is sufficient to indicate the reasoning and the conclusion of the Supreme Court, and those interested are referred to the case as a whole for the complete discussion. What has just been quoted applies alike to the contention that the statute is void because in conflict with the clause of our own Georgia constitution relative to liberty of speech and of the press, as found in the Civil Code (1910), § 6371. The court did not err in overruling the fifth, sixth, and seventh grounds of the demurrer to the indictment.

2. The fourth ground of the demurrer is based on the contention that the allegations of the indictment are not sufficiently specific to identify the literature alleged to have been circulated, or the transaction complained of, so as to protect the defendant from a second prosecution for the same alleged offense, the allegation that the literature alleged to have been circulated was insurrectionary being in its nature a mere conclusion, with no recital of fact to support the same or put defendant in position to defend against the charges against him. This ground of demurrer is without merit. The portions of the literature quoted in the indictment, together with the remaining portions of the indictment, are sufficient to withstand the fourth ground of demurrer. The literature alleged to have been circulated and introduced for the purpose of inciting insurrection, riot, conspiracy, and resistance against the lawful authority of the State, undertakes to array one class of citizens against another. It states that "The program of the Communist Party includes the organization of the working class in every phase of life." By way of parenthesis it may be said that it is doubtful whether the Communist Party does include the organization of all "working" people. It is rather intended to appeal to a restricted class of workers. The literature states that the Communist Party "leads the struggles of the workers, from the most simple every-day demand, *clear up to the final struggle for the overthrow of capitalism and the establishment of the workers' government—the proletarian dictatorship.*" The use of the word "capitalism," followed by the phrase "and the establish-

ment of the workers' government," clearly means that the Communist Party intended to designate the present government as "capitalism" or as a "capitalistic government" in contradistinction to "the workers' government," and the sentence as phrased must be construed to mean that a "workers' government" is identical with a "proletarian dictatorship." This construction is made more certain by the use of the further expression, "defend the Soviet Union." The authorities of the Soviet Union, as is known to all men, claim that it is a "proletarian dictatorship." Therefore the literature alleged to have been circulated advocates the overthrow of the present government of the United States and the establishment of a "proletarian dictatorship," such as now exists in the Soviet Union in Russia.

Webster's New International Dictionary defines the word "proletarian" to mean "one of the wage-earning class; especially a laborer for day wages, not possessed of capital." Reference to smashing the capitalistic government and the establishment of a proletarian government obviously means the establishment of a government restricted to one class of citizenship, to wit, laborers not possessed of capital, that is, a government in which all who possess capital are excluded.

It is insisted in the brief by plaintiff in error that there is nothing in the literature to indicate advocacy of violence; that upon the contrary the literature quoted merely indicates the purpose to use peaceful means. But the quoted literature further includes also the words "against bosses' wars." "smash the National Guard, the C. M. T. C., and the R. O. T. C." By way of argument it is said that in political speeches campaign orators are frequently heard to use the expression "smash the political machine," and therefore the expression in the literature quoted, "smash the National Guard, the C. M. T. C., and the R. O. T. C.," will be considered as having a similar meaning. A sufficient reply to that contention is that a "political machine" is not a part of an organized government. It is the creation of a faction, and generally believed to be inimical to the best interests of the government itself. Against such, General Washington in his "Farewell Address" inveighed with great force and eloquence. Campaign speakers who advocate "smashing the political machine" could not be included as falling within the class of those who advocate the overthrow of the present govern-

ment of the United States and the establishment of a proletarian dictatorship by defending the Soviet Union of Russia, the smashing of the National Guard, the C. M. T. C., and the R. O. T. C., .the latter two organizations being inaugurated and supported by the government of the United States for the preparation and education of its army of defense. It would be surprising indeed if a speaker in a political campaign for the election of officers of the present government should advocate the smashing alike of the government and the political machine. A combination of persons working together in a campaign with the intent and purpose to overthrow the present government of the United States or the States of the Federal Union, by the establishment of a proletarian dictatorship through resistance to the Federal Government and by the smashing of the National Guard, can not be considered as an inoffensive, peaceful aggregation of citizens merely advising that course with the anticipation that the present government will quietly lay down its authority and embrace the principles and form of the proletarian dictatorship of Soviet Russia. Upon the contrary, such an association amounts to more than a "political machine," and it is alleged that in this case the intent is to effectuate its own purpose by violence.

3. The third ground of demurrer attacks the indictment on the ground that the indictment charges that certain described literature was circulated such as "The Daily Worker," "The Liberator," "Out of a Job, by Earl Browder," "Read as You Fight," "Why Every Worker Should Join the Communist Party," "On the Road to Bolshevization," "The Trade Union in Socialist Construction in the U. S. S. R., by Katherina Evdeyeva," "The Communist Manifesto, by Carl Marx and Frederich Engles," "Women in the Soviet Union," "The Program of the Communist International Labor and Southern Cotton Mills, by Myra Page," "State and Revolution, by V. I. Lenin," "Revolutionary Lessons, by V. I. Lenin," "Program of the Trade Union Unity League," "Proletarian Revolution, by V. I. Lenin," "Communist Party U. S. A., District No. 17." A sufficient reply to this ground is that the indictment does not name this literature. It is assumed that this ground was included in the demurrer by mistake, and was intended merely for another indictment against a different party.

4. The second ground of the demurrer contends that the in-

dictment "does not describe said literature or give any notice of its character, contents, or import, or furnish any description of the same, or put the defendant on notice as to the character of the alleged literature alleged to be insurrectionary." The demurrer fails to point out or to indicate the manner or particular in which the indictment fails to give notice, or what further notice is necessary under the law. On that question compare People v. Malley, 49 Cal. App. 597 (7) (194 Pac. 48, 52). This ground of the demurrer is insufficient to raise any issue. It is infected with the infirmity which it seeks to lay to the indictment. "A demurrer, being a critic, must itself be free from imperfection." "Grounds of demurrer which aver that stated paragraphs of the petition should be stricken because 'too uncertain, indefinite, and vague' to 'entitle plaintiff to recover,' or 'to fix any liability upon defendant,' without specifying in what particulars these paragraphs are subject to these criticisms, are themselves too general to present questions for decision to this court. See *Askew* v. *Thompson,* 129 *Ga.* 325 (3), 328 (58 S. E. 854)." *Johnson* v. *Hopkins,* 145 *Ga.* 817 (90 S. E. 60).

5. The first ground of demurrer is as follows: "Said indictment, while enumerating certain literature alleged to have been circulated with insurrectionary intent, does not describe said literature, or give any notice of its character, contents, or import, or furnish any description of the same, or put this defendant on notice as to the character of the alleged literature alleged to be insurrectionary." It follows from what has already been said in the next preceding division of this opinion that the court did not err in overruling this ground.

*Judgment affirmed. All the Justices concur, except*

RUSSELL, C. J., dissenting. Conceding, in the main, the soundness of the legal principles so clearly and elegantly expressed in behalf of the majority, I still can not reach the conclusion that the allegations of this indictment are so plainly and distinctly made as to give to the defendants that fair and adequate opportunity to defend against the charge which is their right under the law of Georgia. It is true that an indictment is sufficient which "states the offense in the terms and language of this Code, or so plainly that the nature of the offense may be *easily understood by the jury.*" (Italics mine.) Penal Code (1910), § 954. But the innate prin-

ciples of justice demand that a citizen shall not be deprived of his life or liberty until he has had a full and fair opportunity to defend himself against the charge; and the right to be fully apprised of what he is expected to meet is a priceless boon. How can he defend when he knows not what he is to. meet, or when the innocence or criminality of the acts with which he is charged is to be left solely to conjecture? As to some of the allegations of the indictment, even if proved as laid, too much must be left to the mere individual opinion which may be indulged in by the jury to permit me to say without hesitation that the circumstances set forth in the indictment clearly indicate that the papers alleged to have been circulated were issued "for the purpose of inciting insurrection, riot, conspiracy, or resistance against the lawful authority of the *State,* or against the lives of the inhabitants thereof, or any part of them." The specific charges contained in the indictment seem to me to indicate the violation of Federal laws, of which the courts of Georgia have no jurisdiction.