## 38771. PARAMOUNT PICTURES CORPORATION v. BUSBEE et al.

SMITH, Justice.

Appellant Paramount Pictures Corp. challenges the Georgia Motion Picture Fair Competition Act, Code Ann. Ch. 106-13, under the free speech and due process provisions of the Georgia Constitution.

Paramount is a Delaware corporation engaged in the production and distribution of motion pictures. In July 1981, appellant filed suit in Fulton Superior Court seeking a judgment declaring Code Ann. Ch. 106-13 unconstitutional and enjoining its enforcement by appellees, who are state officials charged with enforcing the law. The trial court denied Paramount's motion for summary judgment and granted summary judgment for appellees. Paramount brings this direct appeal. We affirm.

The Georgia Motion Picture Fair Competition Act (the Act) was passed by the General Assembly in 1979. The Act, which is similar to statutes currently in force in eighteen other states,[1] is designed to regulate the manner in which motion pictures are distributed for exhibition to the public in Georgia. The heart of the Act is Code Ann. § 106-1304, which prohibits a practice known in the motion picture industry as "blind bidding."[2] Blind bidding occurs when movie distributors such as Paramount solicit bids and enter into licensing agreements with local exhibitors prior to trade screening a film.[3] In order to understand the issues presented by this appeal, a brief review of the role of blind bidding in the motion picture industry is necessary.

---

[1] Alabama, Idaho, Louisiana, Ohio, Oklahoma, Pennsylvania, South Carolina, Maine, Massachusetts, Missouri, New Mexico, New York, North Carolina, Tennessee, Utah, Virginia, Washington, and West Virginia have similar laws prohibiting blind bidding. See Allied Artist Picture Corp. v. Rhodes, 679 F2d 656, 659 n. 2 (6th Cir. 1982).

[2] Code Ann. § 106-1303 (j) provides: "The term 'Blind Bidding' means the bidding for, negotiating for, or offering or agreeing to terms for the licensing or exhibition of a motion picture at any time before such motion picture has either been trade screened within the State or before such motion picture, at the option of the distributor, otherwise has been made available for viewing within the State by all exhibitors from whom the distributor is soliciting bids or with whom the distributor is negotiating for the right to exhibit such motion picture."

[3] Code Ann. § 106-1303 (i) provides: "The term 'trade screening' means the showing of a motion picture by a distributor at the location of the film exchange that distributes his picture in Georgia, which is open to any exhibitor from whom the distributor intends to solicit bids or with whom the distributor intends to negotiate for the right to exhibit the motion picture."

*Blind Bidding and the Motion Picture Industry*

The practice of blind bidding motion pictures is not new. In Allied Artists Pictures Corp. v. Rhodes, 496 FSupp. 408 (S.D. Ohio 1980), affirmed, 679 F2d 656 (6th Cir. 1982), the court reviewed thoroughly the history of blind bidding. Some of its observations bear repeating here: " 'Blind bidding' is a term used in the motion picture industry to describe the licensing of a motion picture to a theater owner without the owner's first viewing the picture. Blind bidding and other practices by which motion picture producers and distributors license their product to exhibitors have been controversial and subject to varying degrees of governmental scrutiny at least since the 1940's, when the Supreme Court was asked to review a far-reaching judicial decree regulating them. United States v. Paramount Pictures, 334 U. S. 131, 157, 68 SC 915, 929, 92 LE 1260 (1948). That decree permitted a theater owner to reject 20% of the films licensed by blind bidding. Although at that time relatively few new films were blind bid, the practice increased steadily during the ensuing decades.

"In 1968 a new consent decree imposed a more stringent restriction, limiting to three the number of films which could be blind bid per year. When that consent decree expired in 1975, the number of films blind bid each year increased rapidly.

"These events paralleled an increasing concentration of production and distribution in a few major companies while theater ownership remained relatively less concentrated. Exhibitors, finding themselves with diminishing clout in bargaining for licenses, complained that the producers and distributors of motion pictures were unfairly using their increasing market power to exact onerous bargaining terms." 496 FSupp. at 412, 413.

The mechanics of blind bidding are quite simple. Six months to a year prior to release of a movie which is in production, a distributor sends requests for bids to exhibitors. Based on a limited amount of information about the upcoming film's plot, cast, and credits contained in the bid request, an exhibitor decides whether and how much to bid for rights to show the movie. The distributor then evaluates the bids and enters into licensing agreements with the preferred exhibitors. See Note, *Blind Bidding and the Motion Picture Industry,* 92 Harv. L. Rev. 1128, 1132 (1979).

The major motion picture distributors such as Paramount prefer to blind bid their films and are generally opposed to state regulation of blind bidding. Blind bidding is advantageous to distributors in several respects. Advance booking of motion pictures assures the distributors exhibition time which coincides with expensive promotional efforts. This is especially important during

holidays and summer vacation, when movie attendance is at its peak. The blind bidding system guarantees the distributors receipt of exhibition revenues shortly after completion of a film and avoids additional financing costs which accompany delayed release of a film.

Motion picture exhibitors, on the other hand, are opposed to blind bidding. They do not like having to bid for rights to show movies that they have not yet seen. Exhibitors also claim that the information supplied them about the films by distributors is often incomplete and misleading. In addition, small independent movie distributors complain that they lack the financial resources and reputation to blind bid their films. As a result, they are unable to compete with the major distributors for first-run exhibition times.[4] Id. at 1132-34.

## This Appeal

It was against this general background that the Georgia General Assembly enacted our anti-blind bidding law. The Act's stated intent is to remedy the ills caused by blind bidding by "establish[ing] fair and open procedures for the bidding and negotiation for the right to exhibit motion pictures within the State . . ., promot[ing] fair and effective competition . . ., and insur[ing] that exhibitors have the opportunity to view a motion picture and know its contents before committing themselves to exhibiting it in their municipalities and towns." Code Ann. § 106-1301. The Act seeks to achieve these objectives by requiring that a motion picture be trade screened prior to negotiation of exhibition rights. The law also invalidates any attempted waiver of its provisions and imposes civil penalties for violations of its terms.

1. Paramount contends that the Georgia anti-blind bidding law, on its face, violates the free speech and due process clauses of the 1976 Georgia Constitution. We will address the free speech claim first.

The free speech clause of the Georgia Constitution provides: "No law shall ever be passed to curtail, or restrain the liberty of speech, or of the press; any person may speak, write and publish his sentiments, on all subjects, being responsible for the abuse of that liberty." Art. I, Sec. I, Par. IV (Code Ann. § 2-104). Paramount argues that the Act's requirement that distributors conduct trade screenings of their films prior to the negotiation of exhibition rights violates this

---

[4] In 1978 the motion pictures marketed by Paramount and six other major distributors accounted for 92% of domestic exhibition revenues. Note, supra, at 1128.

provision because it creates an impermissible risk of delay in the dissemination of protected speech. We disagree.

While motion pictures are unquestionably a constitutionally-protected medium of expression, see *K. Gordon Murray Productions v. Floyd,* 217 Ga. 784, 788 (125 SE2d 207) (1962), Paramount has in this lawsuit failed to show how the Act in fact encroaches upon its freedom of expression. There is no evidence in the record that application of the statute has delayed the opening of a single motion picture in Georgia. Cf. Associated Film Distribution Corp. v. Thornburgh, No. 80-1149 (3d Cir. July 20, 1982). Even assuming, as did the court below, that the Act creates some risk of delay in the distribution and exhibition of motion pictures, we hold that the anti-blind bidding law is a valid exercise of the State's regulatory power.

The Act is clearly content-neutral. Its requirement that distributors trade screen their movies applies to all motion pictures distributed commercially in Georgia, regardless of their content or subject matter. To the extent that the Act affects protected expression, it does so only incidentally. "[G]eneral regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise, have not been regarded as the type of law the First or Fourteenth Amendment forbade Congress or the States to pass, when they have been found justified by subordinating valid governmental interests, a prerequisite to constitutionality which has necessarily involved a weighing of the governmental interest involved." Konigsberg v. State Bar of California, 366 U. S. 36, 50-51 (81 SC 997, 6 LE2d 105) (1961).[5]

As content-neutral legislation regulating trade, a determination of the Act's constitutionality necessarily entails a balancing of the governmental interests it serves against its impact, if any, on

---

[5] We think that this analytical framework, which is well settled in the federal courts, is equally applicable to the Georgia free speech clause. In the absence of controlling state precedent this court has applied analogous First Amendment standards when construing the state constitution. See, e.g., *Retail Credit Co. v. Russell,* 234 Ga. 765 (218 SE2d 54) (1975); *Sanders v. State,* 231 Ga. 608 (203 SE2d 153) (1974).

Appellant cites *K. Gordon Murray Productions v. Floyd,* 217 Ga. 784 (125 SE2d 207) (1962) and *Georgia Gazette Publishing Co. v. Ramsey,* 248 Ga. 528 (284 SE2d 386) (1981) for the proposition that the Georgia Constitution provides a greater degree of protection for speech than does the First Amendment so that federal precedents are irrelevant here. In response, we note that both *K. Gordon Murray and Georgia Gazette* involved prior restraints on speech, which traditionally bear a "heavy presumption against . . . constitutional validity," New York Times v. Sullivan, 403 U. S. 713, 714 (91 SC 2140, 29 LE2d 822) (1971).

protected expression. The Act should be upheld if it furthers an important government interest; if the government interest is unrelated to the suppression of speech; and if the incidental restriction of speech is no greater than is essential to the furtherance of that interest. See United States v. O'Brien, 391 U. S. 367, 377 (88 SC 1673, 20 LE2d 672) (1968); Allied Artists Pictures Corp. v. Rhodes, supra.

First, we note that no adverse impact on expression whatsoever appears from the language of the statute, and that appellant has not proven any adverse impact on its rights. Paramount's only claim is that the Act causes a hypothetical "risk of delay" in distribution and exhibition of its motion pictures. Balanced against this minimal impact on expression are the State's legitimate interests in establishing fair and open bidding practices in the motion picture industry; promoting competition between independent and major film distributors; and allowing exhibitors to view movies prior to bidding on them. Code Ann. § 106-1301. We find these interests to be both legitimate and substantial, and hold that the Act's prohibition on blind bidding is closely tailored to the achievement of these interests.

Further, the law's purposes are wholly unrelated to the suppression of expression. The Act is trade practice legislation which is directed at the motion picture industry not because that industry is in the business of communicating ideas, but because of the industry's unique history and market structure. Finally, we note that the Act actually encourages the free flow of correct information in the sense that it requires the dissemination of accurate and complete information about films prior to bidding for exhibition rights. See Allied Artists Picture Corp. v. Rhodes, 679 F2d 656, 661 (6th Cir. 1982). We therefore hold that the Georgia Motion Picture Fair Competition Act does not violate the free speech clause of the Georgia Constitution.

2. Paramount also contends that the Act violates due process under Art..I, Sec. I, Par. I of the 1976 Georgia Constitution (Ga. Code Ann. § 2-101) in that the law denies appellant the right to contract freely with motion picture exhibitors prior to the trade screening of a particular film.

A purely economic regulation such as the Act will be upheld on review if it bears a rational relation to a proper legislative purpose. *State v. Major,* 243 Ga. 255, 256-58 (253 SE2d 724) (1979). See also Nebbia v. New York, 291 U. S. 502 (54 SC 505, 78 LE 940) (1934). The decision in *Harris v. Duncan,* 208 Ga. 561 (67 SE2d 692) (1951), relied upon by appellant, is distinguishable. The "affected by a public interest" test employed in that case applies only to price controls

enacted by the legislature. The Georgia Motion Picture Fair Competition Act does not attempt to establish price controls in the motion picture industry. As noted above, the Act's declared purposes include promoting competition among motion picture distributors, eliminating unfair and deceptive trade practices, and insuring informed bidding by exhibitors. Code Ann. § 106-1301. We find that the Act rationally relates to these goals so as to satisfy due process.

*Judgment affirmed. All the Justices concur, except Marshall, P. J., who is disqualified, Weltner, J., who dissents, and Bell, J., not participating.*

DECIDED NOVEMBER 22, 1982.

*Arnall, Golden & Gregory, Ellis Arnall, Allen I. Hirsch, William H. Kitchens, Paul D. Springer, Barbara Scott, William Nix,* for appellant.

*Michael J. Bowers, Attorney General, James C. Pratt, Assistant Attorney General,* for appellees.

*Griffin B. Bell, S. Renee Huskey,* amicus curiae.

WELTNER, Justice, dissenting.

I respectfully dissent.

The heart of this controversy is one not of law, but of economic advantage, translated through the political process into a statute of this State.

I see no difference in the market struggles reflected in the "Georgia Motion Picture Fair Competition Act," Code Ann. Ch. 106-13, and in the old Milk Control Law (Ga. L. 1937, p. 247) which was struck down by our Court over thirty years ago in *Harris v. Duncan,* 208 Ga. 561 (67 SE2d 692) (1951). There we held: "The right to contract, and for the seller and purchaser to agree upon a price, is a property right protected by the due process clause of our Constitution, and unless it is a business 'affected with a public interest,' the General Assembly is without authority to abridge that right." 208 Ga. at 564.

Is the elimination of "blind-bidding," as proscribed by this Act more critical to the welfare of Georgians than an adequate supply of wholesome milk?

Are purchasing procedures more affected with a public interest than pricing structures?

I fail to see wherein the competitive struggles of motion picture distributors and exhibitors are "affected with a public interest" to

any greater degree than similar struggles of other producers and consumers. "For an industry or any particular business to become 'affected with a public interest,' its business or property must be so applied to the public as to authorize the conclusion that it has been devoted to a public use and thereby its use, in effect, granted to the public." 208 Ga. at 564.

Will anyone seriously suggest that the film industry is "devoted" to the citizens of Georgia, and "its use granted to the public?"

Further, I most decidedly fail to see wherein the taxpayers should be called upon to pay the costs of carrying a brief for either side, as they have done in *this* case.

The approval by the majority of a "fair competition act" relative to a designated industry presents a major danger for the future. We have now invited all the special interests of Georgia to draft their own "fair competition" acts, which will without doubt strive to preserve and enhance every present competitive advantage, and to create new ones denied them by a free market. We have also assured these interests that, if their lobbying efforts be successful, the taxpayers will thenceforth pay their legal fees and court costs necessary to uphold the legislative product of their labors.

We have opened a door which should remain permanently barred.

The majority seeks to disregard the constitutional protections declared in *Harris v. Duncan* by suggesting that it is limited in its scope only to legislation which fixes consumer prices. While it is true that the legislation struck down in that case was price-fixing in nature, our Constitution cannot be so constricted.

Can we fail to recognize that the final result of *all* competitive advantage is price? Can we deny that this intrusion into an industry will affect bargaining power, and, of necessity, price?

What our Constitution prohibits is not just the regulation of *price,* but any intrusion into the private affairs of individuals regulating their activities where no state interest is involved.

Because *Harris v. Duncan* should be dispositive of this case, I need not allude here to the questions which this statute raises relative to our Constitutional right of free speech.