S11A1252. GRADY v. UNIFIED GOVERNMENT OF ATHENS-CLARKE COUNTY.

(715 SE2d 148)

NAHMIAS, Justice.

Appellant Ian Grady challenges his conviction for violating an Athens-Clarke County ("County") ordinance regulating the volume of noise from "mechanical sound-making devices." He contends that the provision is facially invalid under the free speech clause of the Georgia Constitution. See Ga. Const. of 1983, Art. I, Sec. I, Par. V ("No law shall be passed to curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish sentiments on all subjects but shall be responsible for the abuse of that liberty."). The trial court rejected his claim, and we affirm.

1. On Friday night, April 17, 2009, Grady hosted a party at his apartment in downtown Athens, apparently to celebrate his admission to law school. Grady's residence is in a mixed-use zone that

includes a hotel and residential buildings alongside commercial ones. At 3:30 on Saturday morning, an Athens-Clarke County police officer cited Grady for violating local ordinance § 3-5-24. That law prohibits, among other things, noise from "mechanical sound-making devices" or from a "party" that is "plainly audible" 100 feet away from a person's property limits between midnight and 7:00 a.m. on Saturday and Sunday. There were no noise complaints about the party, but the officer was patrolling the area and heard loud music from over 170 feet away. This was unusual, the officer later testified, because downtown Athens is typically a "ghost town" at 3:30 a.m.

The solicitor later amended Grady's citation to specify violations of § 3-5-24 (c) (2) (a) (mechanical sound-making devices) and (c) (2) (d) (party noise). Grady proceeded to trial before the municipal court, arguing, among other things, that these provisions of the ordinance were facially invalid under the Georgia Constitution's free speech clause. The municipal court acquitted Grady of violating subsection (c) (2) (d) but convicted him of violating subsection (c) (2) (a) and fined him $350. Grady filed a petition for writ of certiorari with the superior court. After a hearing, that court affirmed. Grady then filed an application for discretionary review, which we granted to consider the constitutionality of § 3-5-24 (c) (2) (a).[1]

2. (a) As both parties correctly recognize, subsection (c) (2) (a) regulates constitutionally protected speech.[2] The mechanical devices

---

[1] This Court previously considered a case brought by several college students seeking a declaration that the *entire* Athens-Clarke County noise ordinance was unconstitutional. See *Manlove v. Unified Govt. of Athens-Clarke County*, 285 Ga. 637 (680 SE2d 405) (2009). The majority held that the students there lacked standing because they had not been punished under the ordinance. Id. at 638. The dissent, after arguing that the students did have standing, focused on provisions of the ordinance not at issue in this case. See id. at 639-646 (Sears, C. J., dissenting). Grady has unquestioned standing to lodge a facial challenge to the provision of the ordinance under which he was convicted, as he clearly suffered an "injury in fact" when he was penalized. See *Manlove*, 285 Ga. at 638-639. See also *Granite State Outdoor Advertising, Inc. v. City of Roswell*, 283 Ga. 417, 421 (658 SE2d 587) (2008). He may also challenge how that provision affects the free speech rights of third parties under the "relaxed" standing rule we apply in free speech cases under Georgia law. See id. at 420-421. See also *Young v. American Mini Theatres, Inc.*, 427 U. S. 50, 59-60, 59, n. 17 (96 SC 2440, 49 LE2d 310) (1976) (applying a similar standing test for challenges under the First Amendment to the United States Constitution using the label "overbreadth").

[2] Subsection (c) (2) (a) provides as follows:
*Mechanical sound-making devices.* It is unlawful for any person or persons to play, use, operate, or permit to be played, used, or operated any radio receiving device, television, stereo, musical instrument, phonograph sound amplifier or other machines or devices for the producing, reproducing or amplifying of sound and/or noise at such a volume and in such a manner so as to create, or cause to be created, any *noises or sounds which are plainly audible at a distance of 100 feet or more from the* building, structure, or motor vehicle or in the case of real property, beyond the property limits, in which it is located, whichever is farthest, between the hours of 11:00 p.m. and 7:00 a.m. Sunday through Thursday and between the hours of 12:00 midnight and 7:00 a.m. on Saturday and Sunday.

it targets — such as televisions, stereos, radios, and musical instruments — produce not just random noise, but music and words that qualify for protection as speech. See *Ward v. Rock Against Racism*, 491 U. S. 781, 790 (109 SC 2746, 105 LE2d 661) (1989) (holding that music is a form of protected speech). The ordinance does not, however, discriminate based on the content of the speech. Noises and sounds that are plainly audible at the requisite distances and during the stated times are prohibited, whatever their subject matter or point of view. See id. at 791-792. The parties therefore correctly address subsection (c) (2) (a) as a content-neutral time, place, and manner regulation of speech, which we review for reasonableness. See *Statesboro Publishing Co. v. City of Sylvania*, 271 Ga. 92, 93-95 (516 SE2d 296) (1999).

Were this a First Amendment case, we would consider whether the County ordinance is "narrowly tailored" to serve a significant government interest and leaves open ample alternatives for communication. See, e.g., *Ward*, 491 U. S. at 790; *Statesboro*, 271 Ga. at 93. However, Grady invokes only Georgia's free speech clause, which we have previously held requires not that such a content-neutral time, place, and manner regulation be narrowly tailored but instead that the regulation be the "least restrictive means" of furthering the government's significant interests, while still leaving open ample alternatives to communicate. *Statesboro*, 271 Ga. at 95-96. See also *Coffey v. Fayette County*, 279 Ga. 111, 111 (610 SE2d 41) (2005) ("*Coffey I*").

(b) The rationale for our deviation from the governing First Amendment standard in this one area of free speech law is elusive. As far back as 1932, this Court looked to federal cases interpreting the First Amendment for guidance in applying Georgia's free speech guarantee. See *Carr v. State*, 176 Ga. 55, 61 (166 SE 827) (1932) (holding that the United States Supreme Court's interpretation of the First Amendment "applies alike" to Georgia's "liberty of speech and of the press" provision). In 1982, we said that "[i]n the absence of controlling state precedent this court has applied analogous First Amendment standards when construing the state constitution," and we rejected the argument "that the Georgia Constitution provides a greater degree of protection for speech than does the First Amendment so that federal precedents are irrelevant here." *Paramount Pictures Corp. v. Busbee*, 250 Ga. 252, 255, n. 5 (297 SE2d 250) (1982) (adopting the governing First Amendment test for analyzing content-neutral regulation of commercial trade like distribution of motion pictures).

In *State v. Miller*, 260 Ga. 669 (398 SE2d 547) (1990), however, the Court said the following: "The First Amendment is a broad umbrella that shelters all political points of view and shields a wide

range of avenues for expression, including symbolic speech. *The 1983 Constitution of Georgia provides even broader protection.*" Id. at 671 (footnote omitted; emphasis added). The emphasized statement was not supported by any citation of authority or any discussion of the text, history, or case law regarding the protection of free speech provided in the 1983 or previous Georgia Constitutions. It was inconsistent with precedent like *Carr* and *Paramount Pictures*. And it was pure dictum, as the Court went on to resolve the case by applying "the [First Amendment] test enunciated in *United States v. O'Brien*, 391 U. S. 367, 376 (88 SC 1673, 20 LE2d 672) (1968)." *Miller*, 260 Ga. at 671-672. Nor did *Miller*'s dictum take immediate root. In 1998, for example, citing *Paramount Pictures*, the Court unanimously reiterated that "[w]hen construing the Georgia free speech clause, this Court applies analogous First Amendment standards in the absence of controlling state precedent." *Chamblee Visuals, LLC v. City of Chamblee*, 270 Ga. 33, 34 (506 SE2d 113) (1998).

In 1999, however, a majority of the Court relied on the *Miller* dictum to depart, apparently for the first and only time, from the Court's traditional alignment with First Amendment doctrine. *Statesboro* involved a challenge to a city ordinance that prohibited the distribution of free printed material in yards, driveways, or porches — the sort of content-neutral time, place, and manner regulation of speech also at issue in this case. See 271 Ga. at 92-93. The majority opinion first considered the appellant newspaper's First Amendment challenge to the ordinance, applying the governing United States Supreme Court test, which as mentioned above requires that such regulations "do not refer to the content of the speech, are narrowly tailored to serve a significant government interest, and leave open alternative methods of communication." Id. at 93 (citing *Clark v. Community for Creative Non-Violence*, 468 U. S. 288, 293 (104 SC 3065, 82 LE2d 221) (1984)). The majority acknowledged that this test does not require the government "to adopt the least restrictive means for regulating content-neutral speech." Id. at 94 (citing *Ward*, 491 U. S. at 799). Nevertheless, the majority held that the ordinance violated the First Amendment because it was not narrowly tailored and failed to leave open adequate alternative means of communication. See id. at 94-95.

The majority went on, however, to address whether the ordinance also violated the Georgia Constitution. Citing *Miller*'s dictum that "[o]ur state constitution provides even broader protection of speech than the first amendment," the majority announced that rather than applying the United States Supreme Court's "narrow tailoring" test for content-neutral speech regulations, it would adopt the "least restrictive means" test advocated in a dissent by just two

of that Court's Justices. *Statesboro*, 271 Ga. at 95 (citing *Clark*, 468 U. S. at 313 (Marshall, J., dissenting, joined by Brennan, J.)). Under this even more limiting test, the city ordinance was even more clearly invalid. See id. at 95-96.

Two points about this division of *Statesboro* must be noted. First, the majority went well out of its way to reach the state constitutional issue and make new law on the scope of Georgia's free speech guarantee. The Court had already found the ordinance unconstitutional under the United States Constitution, so finding it to be unconstitutional *again* under the Georgia Constitution was gratuitous. Indeed, Justice Hines did not join this division of the majority opinion, see id. at 96, and Justice Carley's dissent noted that the trial court had addressed only the First Amendment challenge to the ordinance and had not cited the Georgia free speech clause or any case law applying it, which normally means that the Court would not address the state constitutional challenge on appeal. See id. (Carley, J., dissenting).

Second, other than citing the *Miller* dictum, which as discussed above was supported by no authority or reasoning, and the *Clark* dissent, which is not precedent even for the application of the First Amendment, the *Statesboro* majority cited no authority and offered no analysis of constitutional text, history, or precedent to support the proposition that the Georgia free speech guarantee is broader than its federal counterpart. Nor did the majority acknowledge or try to distinguish contrary Georgia precedent such as *Carr*, *Paramount Pictures*, and *Chamblee Visuals*. Moreover, less than two months after *Statesboro*, the Court unanimously held yet again that "Georgia's constitutional free speech provision does not confer any greater free speech right than that protected by the First Amendment." *Cahill v. Cobb Place Assocs.*, 271 Ga. 322, 323 (519 SE2d 449) (1999).

The anomaly in our jurisprudence created by *Statesboro* has led a federal court trying to apply Georgia law to express puzzlement:

> The Georgia Supreme Court has indicated that the Georgia Constitution, "provides even broader protection of speech than the first amendment." *Statesboro*. . . . This Court is not sure why this would be so as the language of the Georgia constitutional provision — no law shall be passed to curtail or restrain the freedom of speech — does not appear substantively different or more onerous than the language of the First Amendment, which prohibits laws that abridge freedom of speech. . . . Nevertheless, the Georgia Supreme Court's general characterization of its jurisprudence notwithstanding, when analyzing sign ordinances, "Georgia courts have consistently applied United States Supreme

Court precedent, drawing no analytical distinction between the state and federal constitutions."

*Kennedy v. Avondale Estates, Ga.*, 414 FSupp.2d 1184, 1216 (N.D. Ga. 2005) (citation omitted).

Thus, our cases saying that Georgia's constitutional protection of free speech is broader than that provided by the First Amendment offer none of the legal reasoning one would normally expect for such an important constitutional point. We do not foreclose the possibility that solid reasons supporting that conclusion may exist, although Grady has not offered any.[3] In any event, *Statesboro*'s ruling that the Georgia Constitution requires a content-neutral time, place, or manner restriction to be the "least restrictive means" of serving the government's asserted interest was a holding by this Court; that holding was followed in *Coffey I*, 279 Ga. at 111-112;[4] neither party initially asked us to reconsider it in this case; and the provision of the Athens-Clarke County ordinance at issue here survives review even under the stricter "least restrictive means" test, so we would reach the same result applying the federal test. We therefore leave further consideration of this important issue for a future case.

(c) There is no dispute that subsection (c) (2) (a) satisfies two of

---

[3] Several of the state high courts that have similarly held that their state constitutions provide greater protection for speech have supported that conclusion with detailed analysis of their specific constitutional language, history, and precedent and comparison to that of the First Amendment, although the validity of that analysis has sometimes been the subject of vigorous dispute. See, e.g., *Davenport v. Garcia*, 834 SW2d 4, 6-23 (Tex. 1992) (holding that the Texas Constitution provides greater protection against prior restraints of speech); id. at 30-43 (Hecht, J., concurring in the judgment) (disagreeing with that conclusion); *Gerawan Farming, Inc. v. Lyons*, 12 P3d 720, 733-739, 748-750 (2000) (holding that the California Constitution provides greater protection to commercial speech); id. at 758-763 (George, C. J., dissenting) (disagreeing with that analysis); *State v. Henry*, 732 P2d 9, 10-17 (Or. 1987) (holding that obscene expression is protected by the Oregon Constitution). Notably, the Texas Supreme Court has explained that such careful analysis, not mere ipse dixit, must support the conclusion that the state constitution provides more protection with regard to the particular point at issue:

> It is possible that Article I, Section 8 [of the Texas Constitution] may be more protective of speech in some instances than the First Amendment, but if it is, it must be because of the text, history, and purpose of the provision, not just simply *because*. Starting from the premise that the state constitutional provision *must* be more protective than its federal counterpart illegitimizes any effort to determine state constitutional standards. To define the protections of Article I, Section 8 simply as one notch above First Amendment protections is to deny state constitutional guarantees any principled moorings whatever. We reject this approach.

*Operation Rescue-Natl. v. Planned Parenthood of Houston & Se. Tex., Inc.*, 975 SW2d 546, 559 (1998) (footnote omitted; emphasis in original). See also id. (noting that there is "nothing to suggest that injunctions restricting speech should be judged by a different standard under the state constitution than the First Amendment").

[4] Dicta in a number of other cases cite *Miller* or *Statesboro* in saying that we have decided that Georgia's free speech protection is broader than the First Amendment's. See, e.g., *Democratic Party of Ga., Inc. v. Perdue*, 288 Ga. 720, 728 & n. 12 (707 SE2d 67) (2011).

*Statesboro*'s three requirements. Like other noise control laws, it serves the significant government interest in protecting both the community in general and individual citizens "from noises which may affect their comfort, repose, health, or safety." *Thelen v. State*, 272 Ga. 81, 83 (526 SE2d 60) (2000). See also *Ward*, 491 U. S. at 796 (holding that government has a " 'substantial interest in protecting its citizens from unwelcome noise' " (citation omitted)); *Kovacs v. Cooper*, 336 U. S. 77, 83 (69 SC 448, 93 LE 513) (1949) (upholding noise ordinance partly because the government has the power to preserve the "tranquility of a community"). And subsection (c) (2) (a) leaves open ample alternatives for expression. Indeed, the provision never prohibits playing, listening to, or making music or other sounds; it merely limits the volume to a degree according to the time of day and day of the week. Compare *Reeves v. McConn*, 631 F2d 377, 383 (5th Cir. 1980) (invalidating a noise ordinance that prohibited "all sound amplification" at various times during the week).

(d) Contrary to Grady's claim, subsection (c) (2) (a) is also the least restrictive means of promoting Athens-Clarke County's significant interest in protecting the comfort and repose of citizens in downtown Athens.

*First*, as the trial court correctly found based on the record, the government drafted what is now subsection (c) (2) (a) deliberately, not arbitrarily, through a long process of gradual refinement that drew on community input and past experience to address specific noise concerns. Compare *Coffey v. Fayette County*, 280 Ga. 656, 657-658 (631 SE2d 703) (2006) ("*Coffey II*") (holding that "a court cannot merely defer to the discretion of the governmental entity imposing" a time, place, and manner speech regulation); *United States v. Doe*, 968 F2d 86, 90-91 (D.C. Cir. 1992) (holding that an "unexplained" 60-decibel noise limit was not narrowly tailored because "zero in the record . . . support[ed] the government's choice"). Earlier versions of the noise ordinance were much broader and less defined. The City of Athens's 1918 rule, for instance, prohibited "any noise at night calculated to disturb the public peace of the city, or the rest and quiet of the citizens thereof," and the 1979 code prohibited "loud or unusual noises which are detrimental or annoying to the public."

But then the City began to refine its approach. In 1980, the City amended its code to prohibit operating radios, musical instruments, and other sound-producing machines more loudly than "is necessary for convenient hearing of the persons who are in the room, vehicle or other chamber." Operating those devices "in such a manner as to be plainly audible at a distance of [50] feet from the building" was prima facie evidence of a violation. A year later, the City amended its code to limit the 50-foot provision to the time between midnight and

7:00 a.m. on Friday and Saturday nights and 11:00 p.m. and 7:00 a.m. the rest of the week. Then, in 1984, the City expanded the 50-foot prima facie rule to 300 feet.

This deliberate refining process continued when the consolidated Athens-Clarke County government adopted the City's ordinance in 1991. The County noted that "the existing City of Athens noise ordinance was created via a very lengthy process of open forum sub-committee meetings with all viewpoints being represented, particularly our students." In contrast, the County's prior ordinance was "ineffective" until 11:00 p.m. because those cited could appear in court to justify noises before that time. In 2001, the County concluded that the existing 300-foot standard had proven too broad, observing that most noise complaints come from densely populated residential areas where people live fewer than 300 feet apart. The County also noted a "marked increase" in concern by neighborhood associations and individual residents on "quality of life issues." Looking to the State's vehicle-noise statute, OCGA § 40-6-14 (a), for guidance, the County reduced the 300-foot rule to 100 feet — still twice as permissive to noise-makers as the 50-foot rule in effect from 1980 to 1984 (and far more permissive than the 25-foot rule struck down in *Deegan v. City of Ithaca*, 444 F3d 135, 140 (2d Cir. 2006)).

Finally, the County amended the provision to its current form in 2003 in response to this Court's holding that an ordinance proscribing "any loud, unnecessary or unusual sound or noise which . . . annoys . . . others" was too subjective to provide constitutionally adequate notice of its prohibitions. See *Thelen*, 272 Ga. at 82-83. The County eliminated subjective elements of the ordinance, like the default rule barring noise that was not "necessary" for "convenient" hearing of the persons who are in the room. In their place, the County simply prohibited noise plainly audible at a distance of 100 feet between 11:00 p.m. and 7:00 a.m. Sunday through Thursday and midnight and 7:00 a.m. Saturday and Sunday.

Despite this history of careful refinement and the County's reliance on community input and specific factual determinations to support its decision to adopt the current ordinance, Grady argues that the County must supply more evidence to prove that the noise prohibited would be harmful at the distances selected. This argument suggests that a government cannot adopt a noise law without evidence from scientific experts, and we know of no such requirement. See *Grayned v. City of Rockford*, 408 U. S. 104, 119-120 (92 SC 2294, 33 LE2d 222) (1972) (citing no such evidence while upholding an anti-noise ordinance). Like the trial court, we believe the record *provides sufficient support for the County's drafting choices.*

*Second*, subsection (c) (2) (a) is tailored to account for changing circumstances at different times and places across Athens-Clarke

County. See *Grayned*, 408 U. S. at 116 ("The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time."). The provision does so primarily through its requirement that the noise be "plainly audible" from certain distances. Whether a specific source of sound is plainly audible from 100 feet or 300 feet away necessarily depends upon the ambient noise at the specific time and place. Because parts of downtown Athens may be much louder than a neighborhood of single-family houses at, say, 12:30 a.m. on a Saturday night, the noise ordinance adjusts to the local conditions automatically. And the County further tailored the ordinance by adjusting the distance limitations for different times of the day and week. Thus, the ordinance applies a 300-foot limitation at most times, narrowing to 100 feet from midnight to 7:00 a.m. on Saturday and Sunday and from 11:00 p.m. to 7:00 a.m. on Sunday through Thursday — times during which many or most citizens are usually trying to sleep.

*Finally*, the County has advanced convincing reasons, supported by the record, for rejecting Grady's proposed means of narrowing the ordinance. Grady contends that subsection (c) (2) (a) should adopt different volume limitations for different zones in Athens-Clarke County, arguing that a bustling area like downtown Athens cannot be subject to the same rules as a neighborhood of single-family homes. But as just discussed, the ordinance does not apply the same volume limitation everywhere, because the "plainly audible" requirement measures the permitted volume according to the ambient noise in each location. Likely for this reason, downtown Athens routinely generates the fewest noise complaints and incidents of any of the County's zones.

Moreover, as the County's Planning Director testified, there is a good reason to impose somewhat similar volume restrictions on both downtown Athens and purely residential neighborhoods — downtown Athens is a mixed-use zone with both residences and hotels next to commercial buildings, and the County is trying to encourage further mixed-use development there. Indeed, Grady was not playing his music too loudly in a bar or other commercial establishment, but rather in his apartment, alongside other residences.

Grady also contends that the ordinance should require a citizen to complain to the police before a citation is issued. He relies on *McKenzie v. State*, 279 Ga. 265 (626 SE2d 77) (2005), for the proposition that the County only has a legitimate interest in regulating "unwelcome" noise. It is true that *McKenzie* struck down a statute banning all indecent phone calls — a content-based and thus "presumptively invalid" speech restriction — mentioning among several factors that the law applied to both welcome and unwelcome

lewd calls. Id. at 267. But nowhere did *McKenzie* hold that a government can regulate an instance of speech only if there is proof that the speech *actually* bothered a *specific* citizen.

Moreover, lewd phone calls are far less intrusive than the noise subject to subsection (c) (2) (a). Listeners can simply hang up on unwanted phone calls; they cannot so easily stop loud music emanating from someone else's residence, building, or vehicle. See *Kovacs*, 336 U. S. at 86-87 (recognizing that a sound-truck ordinance was valid and appropriate because a citizen "is practically helpless to escape this interference with his privacy by loud speakers except through the protection of the municipality," unlike someone walking by an annoying pamphleteer). Loud noise, especially late at night, is particularly intrusive, as disturbed citizens will often need to stop what they are doing — like trying to sleep — and take affirmative steps to quiet the disturbance. The government must have a somewhat freer hand to regulate noise, in a content-neutral way, based on before-the-fact judgments about what level will likely be unwelcome to its citizens at particular times and places.

Grady's proposed citizen-complaint requirement would also have two undesirable consequences. First, it would impose an unusual burden on private citizens, who would be forced to take action, sometimes in the middle of the night, and to lodge an official complaint about a neighbor to law enforcement — and then wait for law enforcement to respond to the complaint before getting any relief. Nor does Grady explain how a citizen-complaint process would work for noise coming from vehicles or passersby carrying sound-making devices, who may be long gone by the time the police could respond. In addition, Grady does not explain why police officers who hear excessive noise — like the officer in this case — could not qualify as citizen complainants.

Second, and even more troubling, Grady's proposed alternative would regulate speech, in part, according to whether individual listeners liked it or instead decided to complain. See *Thelen*, 272 Ga. at 83 (holding that a noise ordinance prohibiting "unnecessary," "unusual," and "annoying" noises was unconstitutionally vague because it depended upon the "individualized sensitivity of each complainant"). Under his approach, speech would no longer be regulated by clear, reasonable, and pre-determined standards but instead arbitrarily by the preferences and sensitivities of individual citizens who happen to live in various areas and are willing to complain. The County was not required to draft its noise ordinance to produce that result.

In sum, Athens-Clarke County drew the challenged provision of its ordinance deliberately and in response to specific concerns, and the County has offered good reasons for rejecting Grady's proposed

alternatives; the provision advances a substantial government interest in the least restrictive way. Furthermore, the provision is content neutral and leaves open ample alternatives for communication. Section 3-5-24 (c) (2) (a) is thus a reasonable, content-neutral time, place, and manner speech regulation, and Grady's facial challenge to it is without merit.

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 12, 2011.

*Charles A. Jones, Jr.,* for appellant.
*William C. Berryman, Jr., Amy S. Gellins,* for appellee.
*Elizabeth P. Bradley, James F. Grubiak, Kelly J. Pridgen,* amici curiae.