In the Supreme Court of Georgia

Decided: June 18, 2018

S18A0496.   MAXIM CABARET, INC. d/b/a MAXIM CABARET et al. v.
CITY OF SANDY SPRINGS, GEORGIA.

GRANT, Justice.

Appellant Maxim Cabaret, Inc. d/b/a Maxim Cabaret is a strip club in Sandy Springs, Georgia, and appellant Theo Lambros is the club's operator, sole shareholder, and president (collectively "Maxim").  Maxim appeals from the Fulton County Superior Court's order granting summary judgment to the City of Sandy Springs on Maxim's legal challenges to city ordinances.  We hold that Maxim's challenges to prior versions of the City's ordinances that have since been replaced or amended are moot; current adult business ordinances prohibiting the sale of alcohol at businesses that offer live nude entertainment constitutionally regulate negative secondary effects of strip clubs without unduly inhibiting free speech or expression; and because the City may constitutionally prohibit Maxim from obtaining a license to sell liquor on its premises under the City's adult business licensing ordinances, Maxim lacks

standing to challenge the City's alcohol licensing regulations. We affirm.

I.

Lambros has owned and operated Maxim Cabaret, an adult entertainment establishment featuring nude dancing, in its current location since March 1992. The club operated in unincorporated Fulton County until December 1, 2005, when it came under the jurisdiction of the newly incorporated City of Sandy Springs. In March 2003, Maxim stopped offering full nudity and offered cabaret entertainment with its performers clothed or partially clothed. At the same time, it applied for and was granted a Fulton County license for on-premises consumption of alcoholic beverages. After experiencing a drop in profits, however, Maxim resumed operating as a full-nudity strip club several months later.

In December 2005, the Sandy Springs city council conducted hearings at which it received and considered information concerning the negative secondary effects of sexually oriented businesses. The minutes reflect that the City was "deeply and profoundly concerned" about criminal activities associated with "the commercial combination of live nudity and alcohol," including specifically "disorderly conduct, prostitution, public solicitation, public indecency, fighting, battery, assaults, drug use, and drug trafficking."

2

The City also expressed concern with other undesirable effects on the community of such establishments, including "commercial depression of property values, an acceleration of community blight in the surrounding neighborhoods," and increased costs for law enforcement and the judicial system. Effective January 1, 2006, the City enacted several zoning, business licensing, and alcohol licensing ordinances regulating adult entertainment establishments.[1] The ordinances included provisions that banned alcohol from the premises of adult entertainment establishments and restricted the permissible locations for such businesses. Under these regulations, Maxim is not authorized to operate as a strip club in its current location.

In January 2006, Maxim sued the City in Fulton County Superior Court, claiming that the City's adult business regulations were unconstitutional and seeking mandamus relief, declaratory and injunctive relief, and damages.[2] In July 2011, the parties moved for summary judgment. The superior court heard argument on the summary judgment motions on November 28, 2011 and May

---

[1] The City's definition of "adult entertainment establishment" encompasses businesses like Maxim that feature nude dancing.

[2] The trial court found that because the City had not enforced its alcohol ban or the adult entertainment business location restrictions against Maxim during the litigation, Maxim had incurred no damages with respect to the licensing and location regulations. Maxim does not contest this finding on appeal.

4, 2015, and on June 10, 2016, issued an order granting summary judgment to the City on all of Maxim's claims.

Shortly after filing its first complaint, Maxim applied for a license to sell and serve alcohol on its premises, which was denied. By agreement with the City, however, Maxim has been allowed to operate with nude dancers and on-premises alcoholic beverage sales in its current location during the pendency of this litigation.

## II.

During the decade-long course of this litigation in superior court, the City amended its adult business ordinances multiple times, in many cases changing or removing provisions that Maxim had alleged to be unconstitutional. Maxim also filed eight amendments to its complaint, the last of which consolidated all of its claims into a single pleading. In its eighth amended complaint, Maxim reasserted its constitutional claims regarding some of the City's ordinances that had since been amended, contending that because the original ordinances were unconstitutional and void, they could not be cured by amendment. In granting the City's summary judgment motion, the superior court found that "the general rule—that repeal of a challenged provision of law renders the challenge moot—applies." On appeal, Maxim claims that this

4

finding was error. We disagree.

Maxim acknowledges that the City has since amended the ordinances at issue to remove or replace the purportedly unconstitutional provisions, and it has not cited to any evidence in the record showing that the complained-of provisions were ever enforced against it. Nor has it shown that there is any likelihood that the original ordinances will be re-enacted and enforced in the future. Under the circumstances, Maxim's claims regarding the previous ordinances are moot. See *Shelley v. Town of Tyrone*, 302 Ga. 297, 307 (806 SE2d 535) (2017) (challenges to zoning ordinance that had been repealed and replaced were moot); *Pawnmart, Inc. v. Gwinnett Cty.*, 279 Ga. 19, 19 n.1 (608 SE2d 639) (2005) (County's amendment of its ordinance to remove objected-to provision rendered Pawnmart's challenge to the provision moot).

Maxim's claims are not saved by its argument that its constitutional challenges to the City's original adult business regulations are not moot because the challenged ordinances were amended rather than repealed and replaced. It is true that "once a statute is declared unconstitutional and void, it cannot be saved by a subsequent statutory amendment, as there is, in legal contemplation, nothing to amend." *In the Interest of R.A.S.*, 249 Ga. 236, 237 (290 SE2d 34) (1982). The same rule applies to ordinances. But the

5

ordinances challenged by Maxim were never declared unconstitutional, and the mere existence of litigation challenging their constitutionality does not preclude an amendment to remove the challenged provisions. See *Shelley*, 302 Ga. at 307.

Because the challenged ordinances no longer exist and were never enforced against Maxim, the resolution of Maxim's claims concerning those ordinances "would amount to the determination of an abstract question not arising upon existing facts or rights," and the trial court correctly determined that those claims were moot. *Sexual Offender Registration Review Bd. v. Berzett*, 301 Ga. 391, 396 (801 SE2d 821) (2017) (citation and punctuation omitted). "'[I]t is a settled principle of Georgia law that the jurisdiction of the courts is confined to justiciable controversies,' and '[w]e will not decide the constitutionality of a law where no justiciable case or controversy is presented.'" Id. (citation omitted).

III.

We now turn to Maxim's surviving claims regarding the constitutionality of existing adult business ordinances.[3] At the heart of Maxim's challenges to

---

[3] Maxim's filings here and at the trial court level are extremely confusing and it is somewhat difficult to discern whether it is challenging current as well as previous adult business ordinances. Because the trial court appeared to believe that current ordinances

the City's adult business regulations is its desire to continue operating as a full-nudity strip club while also selling alcoholic beverages to its customers. The current versions of both the adult business licensing code and the alcohol code contain ordinances prohibiting adult entertainment establishments such as Maxim from serving alcoholic beverages. But according to Maxim, the choice between nude entertainment and alcohol sales is no choice at all, because if it cannot have both it will be forced out of business entirely. Maxim argues on that basis that the City's ordinances infringe upon its right of free expression under the First Amendment to the United States Constitution and Article I, Section I, Paragraph V of the Georgia Constitution. This is not the first time we have heard such a claim, and again, we disagree.

It is true that both the First Amendment and the free speech provision of the Georgia Constitution have been held to protect nude dancing as a form of expressive conduct. See *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (120 SCt 1382, 146 LE2d 265) (2000); *Oasis Goodtime Emporium I, Inc. v. City of Doraville*, 297 Ga. 513, 520 (773 SE2d 728) (2015). But some limitation on the time, place, or manner of such expression is constitutionally permissible,

---

were under challenge, and the City agreed in its March 7, 2018 letter brief to this Court, we conclude that the current ordinances are, in fact, at issue. But we encourage litigants to be as clear as possible in their filings to avoid any such questions.

7

as are appropriately limited regulations targeting the negative secondary effects of adult entertainment establishments. See, e.g., *Pap's A.M.*, 529 U.S. at 290-297; *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48-49 (106 SCt 925, 89 LE2d 29) (1986); *Trop, Inc. v. City of Brookhaven*, 296 Ga. 85, 87 (764 SE2d 398) (2014).

At the outset, we reject Maxim's argument that the City's regulations prohibiting the sale of alcohol in nude dancing establishments should be subjected to strict scrutiny.[4] This Court and the U.S. Supreme Court have held repeatedly that ordinances designed to combat the negative effects of sexually oriented businesses on the surrounding community are to be evaluated as

---

[4] For the first time on appeal, Maxim contends that the U.S. Supreme Court's decision in *Reed v. Town of Gilbert*, ___ U.S. ___, (135 SCt 2218, 192 LE2d 236) (2015) mandates that secondary-effects legislation be subjected to strict scrutiny. But *Reed* did not involve secondary-effects legislation. Nor did the opinion in *Reed* mention, much less overrule, prior cases in which the Supreme Court specifically held that regulations designed to reduce the negative secondary effects of adult entertainment businesses are treated as content neutral and thus subject to an intermediate level of scrutiny. See *City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 447-448 (122 SCt 1728, 152 LE2d 670) (2002) (Kennedy, J., concurring in the judgment); *Renton*, 475 U.S. at 47-49. Under the circumstances, even if we found Maxim's arguments persuasive (which we do not), we would continue to follow the Supreme Court's directly applicable prior precedent. See *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (109 SCt 1917, 104 LE2d 526) (1989) (where precedent of the Supreme Court "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions," lower courts "should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions"); see also *Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs, Ga.*, 703 Fed. Appx. 929, 935-936 (11th Cir. 2017) (unpublished) (applying the prior precedent rule and rejecting a similar argument for strict scrutiny of adult business regulations under *Reed*).

"content-neutral" regulations, which are subject to intermediate scrutiny. See, e.g., *Renton*, 475 U.S. at 47-49; *Oasis*, 297 Ga. at 521; *Goldrush II v. City of Marietta*, 267 Ga. 683, 690 (482 SE2d 347) (1997). The express purpose of the challenged regulations is to combat the criminal activities and other undesirable secondary effects of "the commercial combination of live nudity and alcohol." Sandy Springs Adult Licensing Code § 26-21 (15). Thus, intermediate scrutiny applies.

Under intermediate scrutiny, a content-neutral regulation that causes an incidental restriction on protected speech is constitutionally permissible if it furthers an important governmental interest that is unrelated to the suppression of speech, and its incidental restriction of protected speech is no greater than is necessary to further the important governmental interest. See *Paramount Pictures Corp. v. Busbee*, 250 Ga. 252, 255-256 (297 SE2d 250) (1982) (citing *United States v. O'Brien*, 391 U.S. 367, 377 (88 SCt 1673, 20 LE2d 672) (1968)). Here, before enacting its adult business regulations, the City considered extensive testimony and evidence of the negative secondary effects of strip clubs and other sexually oriented businesses in Sandy Springs and in other cities across the country where such effects have been studied. The City declared that it had "an important governmental interest in reducing crime and

protecting surrounding properties from adverse impacts, which interest is unrelated to the suppression of speech," and that it intended to "enact an ordinance, narrowly tailored, sufficient to combat the undesirable secondary effects of adult entertainment businesses, including the serving and consumption of alcoholic beverages at adult entertainment facilities." Sandy Springs Adult Licensing Code § 26-21 (10) – (11).

At city council hearings, private investigators retained by the City to conduct surveillance within adult clubs in Sandy Springs reported their observation of illegal conduct within and around the clubs, including prostitution, public lewdness, and public intoxication. Sandy Springs residents testified about negative impacts of the adult businesses on their neighborhoods, including offensive litter such as condoms and condom wrappers, discarded underwear, and adult video covers. Residents also testified regarding beer bottles and beer cans thrown in their streets and yards, and frequent late-night dangerous driving along with resulting property damage. A local real estate agent testified that it is more difficult to sell homes located near adult businesses, and that such businesses depress the property values of nearby homes.

The City also relied upon a summary of a Fulton County study

concerning the negative secondary effects of local adult businesses, as well as multiple studies from other cities showing that adult businesses tend to generate crime and lower property values in nearby neighborhoods. In April 2009, when the City amended its adult business regulations, it considered additional information about the negative secondary effects of sexually oriented businesses, including an expert report on studies conducted in jurisdictions across the United States, as well as judicial decisions detailing negative secondary effects of sexually oriented businesses. The legislative record also contained information tending to show that the sale of alcohol increased the negative secondary effects associated with sexually oriented businesses.

The City's prohibition of alcohol in nude dancing establishments thus meets the first prong of the *Paramount Pictures* test because it "furthers the important government interests of 'attempting to preserve the quality of urban life,' and 'reduc[ing] criminal activity and prevent[ing] the deterioration of neighborhoods.'" *Trop*, 296 Ga. at 88 (internal citations omitted). And because the evidence supports the City's assertion that its adult business ordinances were designed to decrease crime and protect property values rather than to suppress speech, the ordinances also meet the second *Paramount*

11

*Pictures* prong, that the regulations address an interest unrelated to the suppression of speech. See *Goldrush II*, 267 Ga. at 692 ("The city's desire to preserve the quality of urban life and its attempt to reduce crime and prevent neighborhood deterioration by separating alcohol from adult entertainment are important government interests unrelated to the suppression of speech.").

Regarding the third and final prong of the *Paramount Pictures* test, whether the incidental restriction of protected speech is limited to that necessary to further the important government interest, Maxim's arguments are not new. We have repeatedly upheld bans on liquor sales in sexually oriented businesses as a method of decreasing the undesirable secondary effects of such businesses with minimal incidental effects on free expression. See, e.g. *Oasis*, 297 Ga. at 525-526; *Trop*, 296 Ga. at 87-88; *Goldrush II*, 267 Ga. at 692-693; *Chambers v. Peach Cty.*, 268 Ga. 672, 674 (492 SE2d 191) (1997). Maxim claims that, if it is not allowed to offer both alcohol and nudity, its business will be forced to close its doors because it will no longer be economically viable. Maxim thus argues that by prohibiting the profitable combination of live nudity and alcohol, the City will effectively eliminate constitutionally protected conduct; that is, nude dance. But constitutional protections are extended to speech and expression, not to profits. See *Renton*, 475 U.S. at 54

12

("The inquiry for First Amendment purposes is not concerned with economic impact." (citation and punctuation omitted)). "Serving alcohol is not itself protected expression, and [the City's ordinance] leaves [Maxim's] employees free to express themselves as they wish through dance or otherwise." *Oasis*, 297 Ga. at 525. Accordingly, the City's adult entertainment ordinances survive intermediate scrutiny.

## IV.

Maxim also contends that the City's licensing ordinances impermissibly "create a nonconforming use" for purposes of the location restrictions within the ordinances. It is true that the City's adult business licensing ordinances limit the locations in which adult businesses may operate.[5] It is also true that Maxim concedes that this is permitted. And the trial court noted that the zoning code contains the same location restrictions for adult businesses. Maxim objects, however, to the licensing code's provision for the amortization of "nonconforming uses"—that is, adult businesses that were operating legally

---

[5] Maxim also argues that the City's zoning and business licensing ordinances together virtually eliminate viable sites for adult businesses within the City. But Maxim affirmatively waived this issue in the trial court, stating in response to the City's motion for summary judgment that it had previously informed the City that "Plaintiffs would not be pursuing their claims against the City in regard to insufficient reasonable alternative avenues of communication. Therefore, Plaintiffs have not and will not argue said claims."

13

prior to the passage of the code but are now prohibited in their current location—which allows affected businesses to continue operating in their current locations during a five-year grace period. Maxim argues that this amortization provision is invalid because only a change in zoning ordinances can create nonconforming uses, and there has been no change in zoning for Maxim's location. It is not entirely clear why Maxim would object to being given a grace period within which to relocate its business;[6] regardless, Maxim has not shown that the amortization provision has been or will be applied to it, and it therefore lacks standing to challenge that part of the City's licensing code. See *Atlanta Taxicab Co. Owners Ass'n, Inc. v. City of Atlanta*, 281 Ga. 342, 345 (638 SE2d 307) (2006) (to challenge a law, "the plaintiff must normally show that it has interests or rights which *are or will be affected*" by the law) (citation omitted) (emphasis in original).

First, the amortization provision by its terms applies only to those adult businesses that produce a certificate of occupancy showing that they were operating in compliance with all other laws and regulations when the City's location restrictions were enacted. The City denies that Maxim has ever

_____

[6] Maxim does not challenge the trial court's conclusion that municipalities may constitutionally enforce location restrictions by requiring nonconforming businesses to change their business practices, change locations, or close within a reasonable time.

produced the required certificate of occupancy, and Maxim has not shown otherwise by citation to the record on appeal. Second, even if the amortization provision were applicable to Maxim, the five-year grace period would have long since expired, rendering Maxim's challenge to the provision moot. Maxim's amortization challenge thus fails.

V.

Maxim's final contention is that the trial court erred in finding that it lacked standing to challenge the City's alcohol code. To mount that kind of attack, a party must show that it has suffered some injury from the challenged provisions. See *Parker v. Leeuwenburg*, 300 Ga. 789, 790 (797 SE2d 908) (2017); *Granite State Outdoor Advertising, Inc. v. City of Roswell*, 283 Ga. 417, 420 (658 SE2d 587) (2008). And we have been clear that where a license or permit is denied under a constitutionally *permissible* provision of a statute, the complaining party lacks standing to challenge *other* provisions of the law that were not applied to it. See *Granite State*, 283 Ga. at 420-421. Because the City's adult business licensing regulations prohibiting the sale of alcohol are not unconstitutional, Maxim is not permitted to apply for an alcohol license in the first place, and therefore lacks standing to challenge the City's alcohol code, which applies only to businesses applying for or possessing a license to

15

sell alcohol.

    <u>Judgment affirmed.  All the Justices concur.</u>

S18A0496.  MAXIM CABARET, INC. d/b/a MAXIM CABARET et al. v. CITY OF SANDY SPRINGS.

PETERSON, J., concurring.

I concur fully in the Court's decision, which is a faithful application of our precedents. I write separately to express my concern with our approach to constitutional interpretation reflected in those precedents.

I agree that Maxim's free speech claims under the United States Constitution and the Georgia Constitution should be rejected. As the Court's decision explains, their federal claim fails. And Maxim has not articulated a single reason why the Georgia Constitution should be interpreted as giving them any greater rights than the United States Constitution, and so their claim under the Georgia Constitution necessarily also fails. But our cases holding that the Georgia Constitution protects nude dancing at all rest on a shaky premise.

Although we have extended state constitutional protection to nude dancing for nearly 30 years, we have done so without any actual analysis of the Georgia Constitution. We first held that the Georgia Constitution's Speech Clause protects nude dancing in Harris v. Entertainment Systems, Inc., 259 Ga.

701, 702 (1) (a) (386 SE2d 140) (1989). But we did so without any consideration of the text, context, or history of that provision; indeed, we explicitly declined to do any actual construction of our Constitution at all. Rather, framing the issue as whether the statute in question reached expression protected by the First Amendment or the Georgia Constitution's Speech Clause, we declared that, "[a]s this Court has never directly addressed the issues this appeal raises with regards to Georgia's protection of speech, we will apply First Amendment standards." Id. (citing Paramount Pictures Corp. v. Busbee, 250 Ga. 252, 255 n.5 (297 SE2d 250) (1982) (stating that "[i]n the absence of controlling state precedent[,] this court has applied analogous First Amendment standards when construing the state constitution")). We concluded that "because at least some of the proscribed conduct would fall within the purview of First Amendment protection, it [was] also protected by 1983 Georgia Constitution Art. I, Sec. I, Par. V." Id. But simply importing federal standards without analysis is not the way a state's highest court should interpret its constitution.

And ever since, when the question of the Georgia Constitution's protection of nude dancing has arisen, we've relied on Harris or its progeny. See, e.g., Pel Asso, Inc. v. Joseph, 262 Ga. 904, 905 (1) (427 SE2d 264) (1993)

2

(citing <u>Harris</u>); <u>Gravely v. Bacon</u>, 263 Ga. 203, 205 (1) (429 SE2d 663) (1993) (citing <u>Pel Asso</u>); <u>Oasis Goodtime Emporium I, Inc. v. City of Doraville</u>, 297 Ga. 513, 520 (3) (773 SE2d 728) (2015) (citing <u>Harris</u> and <u>Gravely</u>).

The text of the Georgia Constitution's Speech Clause is quite different from the Speech Clause of the First Amendment. See Ga. Const. Art. I, Sec. I, Para. V ("No law shall be passed to curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish sentiments on all subjects but shall be responsible for the abuse of that liberty."); see also <u>Tucker v. Atwater</u>, No. S18C0437, 2018 Ga. LEXIS 404, at *5 n.3 (June 4, 2018) (Peterson, J., concurring) (noting textual difference). Whether the text's reference to the right to "speak, write, and publish" describes the scope of the "freedom of speech" that the Georgia Constitution protects is unclear to me.

And "the freedom of speech" that the Speech Clause protects must be understood in the light of what that term meant at the time it was adopted. See <u>Olevik v. State</u>, 302 Ga. 228, 235 (2) (c) (i) (806 SE2d 505) (2017). That term appeared first in the Constitution of 1861. See Ga. Const. of 1861, Art. I, Sec. 8 ("Freedom of thought and opinion, freedom of speech, and freedom of the press, are inherent elements of political liberty. But while every citizen may

3

freely speak, write and print, on any subject, he shall be responsible for the abuse of the liberty."). Similar provisions appeared in the 1865 and 1868 Constitutions. See Ga. Const. of 1865, Art. I, Sec. 6 ("Freedom of speech, and freedom of the press, are inherent elements of political liberty. But while every citizen may freely speak or write, or print on any subject, he shall be responsible for the abuse of the liberty."); Ga. Const. of 1868, Art. I, Sec. 9 (same with minor punctuation differences). In 1877, the Speech Clause took a form almost identical to that applicable here, except that it used the phrase "the liberty of speech" instead of "freedom of speech." See Ga. Const. of 1877, Art. I, Sec. I, Para. XV ("No law shall ever be passed to curtail, or restrain, the liberty of speech, or of the press; any person may speak, write, and publish his sentiments, on all subjects, being responsible for the abuse of that liberty."). And so it remained until the 1983 Constitution returned to the "freedom of speech." See Ga. Const. of 1945, Art. I, Sec. I, Para. XV (same); Ga. Const. of 1976, Art. I, Sec. I, Para. IV (same with minor punctuation differences). What all of this means for the meaning of the Georgia Constitution's Speech Clause is a question we've never attempted to answer in this context.

In any event, in Harris, two Justices of this Court dissented from the holding that the Georgia Constitution's Speech Clause protects nude dancing:

4

> The first Constitution of Georgia, in the year 1777, guaranteed freedom of the press. The 1877 Constitution guaranteed freedom of speech. I cannot believe that our forebears, in writing these protections, intended to vest in each Georgian a constitutional right to dance naked for tips in a barroom. Nor do I think that the citizens of Georgia who ratified the Constitution of 1983 intended to preserve or to create any such "right."

Harris, 259 Ga. at 705 (3) (Weltner, J., joined by Marshall, C. J., dissenting). We have since characterized as "interesting" an argument that Justice Weltner was correct, but found that the answer wouldn't affect the outcome, and so we didn't need to decide the question. See Oasis Goodtime Emporium, 297 Ga. at 520 n.11.

Admittedly, Justice Weltner's dissent wasn't exactly the fulsome analysis of the "language, history, and context" of the Speech Clause that is required. See Olevik, 302 Ga. at 234 (2) (b) n.3; see also Grady v. Unified Gov't of Athens-Clarke Cty., 289 Ga. 726, 731 (2) (b) n.3 (715 SE2d 148) (2011) (explaining that proper state constitutional interpretation requires "detailed analysis of their specific constitutional language, history, and precedent and comparison" to similar federal provisions); Miller v. Deal, 295 Ga. 504, 511 (761 SE2d 274) (2014) (rejecting state constitutional argument where "[n]owhere in the papers filed by the plaintiffs do we find a reasoned

5

argument — supported by an analysis of the pertinent constitutional text, structure, and history — that the guarantee of due process in the Georgia Constitution means something more in this context than the same guarantee in the United States Constitution"). But there's no reason why the Georgia Constitution has to protect everything that the United States Constitution protects. Olevik, 302 Ga. at 234 (2) (b) n.3 (noting that "a state constitution may . . . offer less rights than federal law, so long as it does not affirmatively violate federal law"). And although we have interpreted the Georgia Constitution's Speech Clause as more protective of speech than the First Amendment in at least one context, see K. Gordon Murray Productions, Inc. v. Floyd, 217 Ga. 784, 790-793 (125 SE2d 207) (1962) (holding prior restraint of movies valid under United States Constitution but invalid under Georgia Constitution), that doesn't necessarily mean that it would be broader (or even coextensive) in every other context.

But again, as in Oasis Goodtime Emporium, we don't need to reconsider our precedent today, because even under that precedent, Maxim loses. And, indeed, in any case in which the plaintiff brings claims under both the United States and Georgia Constitutions, there may not be a real reason to reconsider that precedent. If future plaintiffs bring both claims and lose under the United

6

States Constitution, they'll lose under the Georgia Constitution regardless of whether it protects nude dancing the same or less than the United States Constitution; reconsideration of our precedent under the Georgia Constitution would matter in such a case only if we concluded that our Constitution was *more* protective in this context. And if plaintiffs bring both claims and win under the United States Constitution, the scope of the Georgia Constitution is immaterial — an ordinance that violates the United States Constitution is invalid regardless of whether it also violates the Georgia Constitution.

Nevertheless, if an appropriate case were to arise, we should again consider the question we answered in Harris, but this time in the light of the Georgia Constitution's language, history, and context.

I am authorized to state that Justice Nahmias and Justice Blackwell join in this concurrence.

7